## KANN v. UNITED STATES.

### No. 5199.

Circuit Court of Appeals, Fourth Circuit.

Feb. 4, 1944.

Writ of Certiorari Granted Apr. 10, 1944.

See 64 S.Ct. 938.

Simon E. Sobeloff, of Baltimore, Md. (Bernard M. Goldstein, of Baltimore, Md., on the brief), for appellant.

William A. Paisley, Sp. Asst. to the Atty. Gen. (Bernard J. Flynn, U.S. Atty., and Ellis L. Arenson, Sp. Atty., Department of Justice, both of Baltimore, Md., on the brief), for appellee.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

Gustav H. Kann (hereinafter called Kann) was, with several others with whom we are not now concerned, tried in the United States District Court for the District of Maryland under an indictment containing three counts for violations of the Mail Fraud Statute, 18 U.S.C.A. § 338. Kann, found guilty and sentenced under the second and third counts, has duly appealed.

This appeal has raised many questions. Many of these questions are so lacking in substance that they require little or no notice. Into this category, we think, fall appellant's objections to the admission of evidence, to the instructions given by Judge Chesnut in the District Court, and to certain comments on the evidence made by Judge Chesnut to the jury. We proceed to discuss, then, the three most important questions in the case: was there substantial evidence to support the jury's finding

(1) that the formation of the Elk Mills Loading Corporation (hereinafter called Elk Mills) was a fraudulent scheme; (2) that Kann had knowledge of, and participated in, the fraudulent scheme; (3) that Kann caused the mails to be used in furtherance of the fraudulent scheme.

### (1) The Elk Mills Loading Corporation.

██ Triumph Explosives, Incorporated, (hereinafter called Triumph) had large contracts with the United States Government for the production of explosives. About 80% of the stock of Triumph was owned by numerous stockholders scattered over the country. Kann was President of Triumph, Joseph Decker was Vice-President of Triumph. These two men controlled and dominated its policies and activities. Both were directors and among the other five directors of Triumph were a brother and a brother-in-law of Kann.

Triumph had borrowed substantial sums from certain banks. In connection with these loans, Triumph agreed to certain restrictions on the sums it could spend for either capital outlays or increased salaries for its employees. Kann strenuously insisted, and evidence was introduced to show, that the organization and the operations of Elk Mills was a legitimate business necessity, in the light of these restrictions, in order that Triumph might duly carry out its large and important contracts with the United States Government. The theory of the prosecution was that the formation and operations of Elk Mills constituted a scheme and artifice to enrich Kann and his co-defendants by siphoning off funds in fraud of Triumph and its shareholders. Of course, the jury is the sole judge of the credibility of the witnesses, and the finding of the jury here that the organization and activity of Elk Mills was a fraudulent scheme is binding on us if this finding is supported by substantial evidence. We think that this finding is so supported.

It is sufficient, we think, to set out, without elaborate comment, some of this evidence. Triumph, whose stock was widely held, turned over to Elk Mills a million-dollar contract of Triumph with the United States Government. About 45% of the stock of Elk Mills was held by Kann's co-defendants, for which no payment whatsoever was made. Elk Mills was thus enabled to make a profit of almost $300,000 in six months; and, in addition to their compensation from Triumph, Kann and his co-defendants received from Elk Mills about $65,000 in salaries and bonuses. One of the bankers testified that every request from Triumph to extend the limit for capital outlay and increases in salaries had been duly approved.

There was evidence to show that three of the seven directors of Triumph knew nothing of the Elk Mills scheme until Commander Seidman, of the Navy Department, uncovered the facts; that notice of the meeting of Triumph's directors did not, as Triumph's by-laws required, state the object of the meeting—the approval of the Elk Mills scheme; that the minutes of Triumph showed the presence of two directors at this meeting, when, as a matter of actual fact they were not present when the Elk Mills scheme was discussed, though they had been present at the earlier part of the meeting; that Triumph's employees and facilities had been freely used in the making of the products for which Elk Mills was paid; that Kann, his nephew, and Decker formed a majority of the Board of Directors of Elk Mills and dominated its activities. Three other bits of evidence may be mentioned in this connection. One is the letter of Kann's brother-in-law, A. Leo Weil, Jr., an attorney, sent to Kann. This clearly shows that Weil was not pleased with many details in the Elk Mills picture. Then the jury might well have been impressed by the evidence as to the demeanor and bearing of Kann and his associates when discovery became inevitable. Finally, there was evidence of the admittedly unsavory plot involving the sale of the land and timber in connection with the Elk Mills scheme. Whatever effect may be analytically attributed to each of these (and other) incidents, the composite picture, viewed in its background, furnished adequate ground for the jury's determination that the Elk Mills device was conceived in sin and born in iniquity. There was ample evidence here of many of the so-called badges of fraud.

### (2) The Guilty Knowledge of Kann.

██ Counsel for Kann, on oral argument, earnestly contended that there was no substantial evidence to justify the finding by the jury that Kann had knowledge of, or participated in, the fraudulent aspects of the Elk Mills device. With this, we cannot agree. If, as the jury found upon substantial evidence, the Elk Mills scheme was fraudulent both in its inception and in its execution, the whole picture is utterly inconsistent with any idea that Kann's

relation to the fraudulent scheme was merely that of an innocent bystander.

We could predicate our holding here, without any necessity for comment, upon what we have said on the preceding contention. We however, summarize or enumerate some of the more salient features which give validity before us to the jury's finding that Kann both knew of, and took an active part in, the fraudulent Elk Mills transactions. Kann and Decker dominated both Triumph and Elk Mills; Kann was a director of both corporations, the President of one, Vice-President of the other. He expected to profit personally, and did profit personally, through the Elk Mills scheme, at the expense of the shareholders of Triumph. Even if he were innocent before, (an assumption which we think is utterly without warrant), the Weil letter must have put him on notice. It would be indeed strange to presume that he was ignorant of the deficiency in the notice calling the meeting of the Board of Directors of Triumph to consider the Elk Mills proposition, the absence of the two directors when the Elk Mills transaction was discussed, though these directors had been present at the first part of the meeting, and the consequent falsification of Triumph's minutes and the fact that his co-defendants (the so-called key men who were so essential to Triumph's war contracts) paid nothing for their stock in Elk Mills. Hardly, too, could Kann have been ignorant that while a major share of the profits was siphoned off by the Elk Mills conspirators, a large part of the work was done by the employees, and with the facilities, of Triumph. And not without significance is the evidence of Kann's demeanor and actions when the investigators of the Navy Department let the cat out of the bag.

### (3) The Use of the Mails.

 Finally, there is the contention that Kann could not be charged with the use of the mails in furtherance of the fraudulent scheme. Kann is bound by the acts of his fellow conspirators done within the scope of the conspiracy. Preeman v. United States, 7 Cir., 244 F. 1; Ader v. United States, 7 Cir., 284 F. 13; Tincher v. United States, 4 Cir., 11 F.2d 18; Mackett v. United States, 7 Cir., 90 F.2d 462. The fraudulent use of the mails was predicated upon the cashing of checks by Kann's co-defendants. The check which formed the basis of the second count in the indict-ment was a check of the contractor, Jackson, drawn upon a bank at Wilmington, Delaware, and cashed at a bank in Elkton, Maryland. The check forming the basis of the third count was drawn on a bank at Elkton, Maryland, and was cashed by Willis at a bank in Newark, Delaware. If, as we have indicated, Kann is held responsible for the acts of his associates in cashing these checks, we think the jury was justified in finding that Kann was a party to the mailing of these checks by the bank which cashed them, to the bank on which the checks were drawn.

This question was discussed by us at some length in our opinion in Decker v. United States, 140 F.2d 378. Incidentally, Kann was a codefendant in that case. We think it is unnecessary to add anything here to what was said in that opinion, in Judge Parker's opinion in the Tincher case, supra, and in Judge Chesnut's opinion in the Decker case in the District Court, 51 F.Supp. 15. We might remark that here, as there, substantial evidence indicated that the conspiracy was a continuing one. That the parties to the instant case contemplated a rather extensive use of the mails is shown by letters sent to the Postmaster at Elkton, Maryland, asking that all mail for Elk Mills be placed in the post-office box of Triumph.

The judgment of the District Court is affirmed.

Affirmed.