## KANN *v.* UNITED STATES.

No. 35.   Argued November 7, 1944.—Decided December 4, 1944.

*Mr. Simon E. Sobeloff,* with whom *Mr. Bernard M. Goldstein* was on the brief, for petitioner.

*Mr. William A. Paisley,* with whom Solicitor General *Fahy,* Assistant Attorney General *Tom C. Clark, Mr. Robert S. Erdahl,* and *Miss Beatrice Rosenberg* were on the brief, for the United States.

MR. JUSTICE ROBERTS delivered the opinion of the Court.

We took this case because it involves important questions arising under § 215 of the Criminal Code.[1] The section provides that "Whoever, having devised . . . any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, . . . shall, for the purpose of executing such scheme or artifice or attempting so to do, place, or cause to be placed, any letter . . . in any post office, or . . . cause to be delivered by mail according to the direction thereon . . . any such letter, . . . shall be fined not more than $1,000, or imprisoned not more than five years, or both."

The petitioner and six others were indicted in three counts for using the mail in execution of a scheme to defraud. Petitioner's co-defendants pleaded *nolo contendere*. He was tried and convicted on the second and third counts, and the Circuit Court of Appeals affirmed the conviction.[2]

The indictment alleged that Triumph Explosives, Inc. is a Maryland corporation engaged in the manufacture of munitions, for the United States, a large amount of whose stock is held by the general public; that petitioner was President, and a director, one of his co-defendants was an officer and director and five of them salaried executive and administrative employes of the company. The indictment continued that the defendants devised a scheme to defraud Triumph and its stockholders and obtain money for themselves by diverting part of the profits of Triumph on its Government contracts to a corporation known as Elk Mills Loading Corporation and distributing such profits through salaries, dividends, and

---

[1] 18 U. S. C. § 338.
[2] 140 F. 2d 380.

bonuses to be paid by Elk Mills to the defendants; that, in pursuance of the scheme, Elk Mills was organized, some defendants elected officers and directors, and others elected consultants at substantial salaries, and 49% of its stock distributed to five defendants, who were administrative employes of Triumph, without consideration; that Triumph, pursuant to the plan, subcontracted a Government contract to Elk Mills for 51% of the latter's stock, on a basis which would yield Elk Mills large profits, and would involve utilization of the employes and services of Triumph in the performance of the subcontract; and that the defendants, pursuant to the scheme, received from Elk Mills salaries and bonuses for which no substantial services were rendered, and dividends, to the detriment of Triumph. It was alleged that the fraudulent scheme was misrepresented upon the minutes of Triumph and false reasons for the transaction given. Further, that, pursuant to the scheme, it was to be represented that some of the defendants would purchase with their own money, and convey to Elk Mills, certain lands for the issue to them of 49% of the stock of Elk Mills, whereas it was not intended that these defendants should use their own funds in purchasing the land to be transferred in payment of the stock, and that this plan was carried out. In summary, it was charged that the scheme was such that Triumph should be deprived of the profits rightfully belonging to it and these profits should be distributed amongst the defendants through the instrumentality of Elk Mills; that bonuses were to be paid to each of the defendants out of the profits of Elk Mills, and such bonuses were paid.

In the first count it was charged that the defendants, for the purpose of executing the scheme, caused to be delivered by mail a check drawn by Elk Mills on the Peoples Bank of Elkton, Maryland, in favor of petitioner.[3]

---

[3] The Government abandoned the first count at the trial.

In the second, it was charged that, for the same purpose, the defendants caused to be placed in the post office at Elkton a check drawn by one Jackson on Industrial Trust Company of Wilmington, Delaware. In the third, it was charged that, for the same purpose, the defendants caused to be delivered by mail a check drawn by Elk Mills on the Peoples Bank of Elkton in favor of one of the defendants, Willis.

At the trial the Government proved the corporate existence of Triumph, proved that Triumph held Government contracts, that Elk Mills was incorporated and became subcontractor of a Government contract, that the stock of Elk Mills was distributed amongst certain of the defendants and Triumph, as in the indictment alleged, that, under the subcontract, Elk Mills was in receipt of substantial profits and that these profits were used to pay salaries and bonuses to the defendants, including petitioner. The Government offered evidence tending to prove that certain of these actions had been concealed from other directors of Triumph and that the true situation was discovered when a federal officer made an audit of Triumph's transactions under Government contracts.

The petitioner offered evidence tending to prove that in order to expand Triumph's business two banks had loaned large sums to Triumph under written agreements which restricted the amount it could invest in capital assets and restricted the salaries and bonuses it could pay; that the four defendants who were executive employes were dissatisfied with their compensation and threatened to leave Triumph unless they should receive increased compensation; that the directors of Triumph devised the plan of incorporating Elk Mills and subcontracting with it to make possible the payment of salaries and bonuses without violating Triumph's agreements with its banks; that petitioner had no other motive in participating in the transactions relating to Elk Mills, and that, upon being

advised of the arrangement, Triumph's banks were of opinion that it did not violate the agreements.

It was proved by the Government that one Jackson contracted with Triumph for the building of a factory for Elk Mills on land conveyed to Triumph by several of the defendants. Some of these defendants informed the contractor that he might use the timber standing on the land in the construction of the building. After he had done so they falsely represented to him that they owned the timber and that he must pay them some $12,000 for it. He did so, by a check, to their order, and, in turn, billed Triumph for the same amount. There was evidence that the petitioner was asked whether it was proper to pay the bill and that he stated he did not see why not. It is not contended that the petitioner received any of this money, and his evidence tended to show he had no knowledge of this fraud perpetrated on Triumph.

The use of the mails proved under count 2 was this: The check of Jackson, the contractor, for purchase of the timber, to the order of defendants Deibert, Feldman, Kann (not petitioner), Prial, and Willis, was by them endorsed and cashed at the Peoples Bank of Elkton, Maryland, and was, by that bank, deposited in the mail to be delivered to the bank in Wilmington, Delaware, on which it was drawn.

With respect to the third count, the proof was that Elk Mills delivered its check on the Peoples Bank of Elkton for $5,000 to Willis, one of the executive employes, as a bonus. It was endorsed by Willis and deposited with the Farmers Trust Company of Newark, Delaware. The Newark bank mailed the check to the Peoples Bank of Elkton.

The petitioner contends, first, that there is no substantial evidence that the transactions involving Elk Mills' subcontract were other than innocent transactions

intended to finance the Government contracts held by Triumph, in conformity to that Company's agreements with the bank; or, if the transactions were for an improper purpose, there is no proof that he was a party to any improper use of funds. Secondly, the petitioner urges that he admittedly received no money from the checks which are described in counts 2 and 3, and there is no proof he had knowledge, or reasonable cause to believe, that the checks would go through the mails and, therefore, he did not cause them to be sent or delivered within the intent of the statute. Thirdly, he urges that the mailing of the checks by the paying banks could not be for the purpose of executing the scheme since the defendants to whom those checks were delivered had received the money represented by the checks and each transaction, after such receipt, was irrevocable as respects the drawer.

The petitioner strenuously argues his first contention, but, in the view we take of the case, we find it unnecessary to review the evidence, if we were otherwise inclined to do so in the face of the agreement of the courts below that a case was made for the jury on the question of the fraudulent nature of the scheme and the petitioner's participation in it.

With respect to the second contention, while there may be some question as to whether the defendants may be said to have "caused" the mailing of the checks, we think it a fair inference that those defendants who drew, or those who cashed, the checks believed that the banks which took them would mail them to the banks on which they were drawn, and, assuming the petitioner participated in the scheme, their knowledge was his knowledge.[4]

The remaining contention is that the checks were not mailed in the execution of, or for the purpose of executing, the scheme. The check delivered to the five defendants

---

[4] *Weiss* v. *United States*, 120 F. 2d 472; *Steiner* v. *United States*, 134 F. 2d 931; *Blue* v. *United States*, 138 F. 2d 351.

by the building contractor in payment for timber they claimed to own was cashed by them at a local bank in Elkton, Maryland. By cashing it they received the moneys it was intended they should receive under the scheme. The Elkton bank became the owner of the check.[5] The same is true of the bonus check delivered to defendant Willis and deposited and credited to his account. The banks which cashed or credited the checks, being holders in due course, were entitled to collect from the drawee bank in each case and the drawer had no defense to payment. The scheme in each case had reached fruition. The persons intended to receive the money had received it irrevocably. It was immaterial to them, or to any consummation of the scheme, how the bank which paid or credited the check would collect from the drawee bank. It cannot be said that the mailings in question were for the purpose of executing the scheme, as the statute requires.[6]

The case is to be distinguished from those where the mails are used prior to, and as one step toward, the receipt of the fruits of the fraud, such as *United States* v. *Kenofskey,* 243 U. S. 440.[7] Also to be distinguished are cases where the use of the mails is a means of concealment so that further frauds which are part of the scheme

---

[5] This is so under the Uniform Negotiable Instruments Act which has been adopted in Maryland and in Delaware. Anno. Code of Maryland 1939, Art. 13, § 76; Revised Code of Delaware (1935), c. 78, Art. 4, § 57. This Act has adopted the rule announced in *Burton* v. *United States,* 196 U. S. 283, 297; *City of Douglas* v. *Federal Reserve Bank,* 271 U. S. 489, 492; *Dakin* v. *Bayly,* 290 U. S. 143, 146.

[6] *McNear* v. *United States,* 60 F. 2d 861; *Dyhre* v. *Hudspeth,* 106 F. 2d 286; *Stapp* v. *United States,* 120 F. 2d 898; *United States* v. *McKay,* 45 F. Supp. 1001.

[7] See also *Shea* v. *United States,* 251 F. 440; *Spear* v. *United States,* 228 F. 485; *Savage* v. *United States,* 270 F. 14; *Stewart* v. *United States,* 300 F. 769; *Tincher* v. *United States,* 11 F. 2d 18.

may be perpetrated.[8]  In these the mailing has ordinarily had a much closer relation to further fraudulent conduct than has the mere clearing of a check, although it is conceivable that this alone, in some settings, would be enough. The federal mail fraud statute does not purport to reach all frauds, but only those limited instances in which the use of the mails is a part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law.

The Government argues that the scheme was not complete, that so long as Elk Mills remained a subcontractor the defendants expected to receive further bonuses and profits and that the clearing of these checks in the ordinary course was essential to its further prosecution.  But, even in that view, the scheme was completely executed as respects the transactions in question when the defendants received the money intended to be obtained by their fraud, and the subsequent banking transactions between the banks concerned were merely incidental and collateral to the scheme and not a part of it.

We hold, therefore, that one element of the offense defined by the statute, namely, that the mailing must be for the purpose of executing the fraud, is lacking in the present case.  The judgment must be reversed.

*Reversed.*

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK, MR. JUSTICE JACKSON and MR. JUSTICE RUTLEDGE concur, dissenting.

I hardly think we would set this conviction aside if the collecting bank instead of cashing the checks took them for collection only and refused to pay the defendants until the checks had been honored by the drawee.  It is plain

---

[8] See e. g. *United States* v. *Lowe,* 115 F. 2d 596; *United States* v. *Riedel,* 126 F. 2d 81; *Dunham* v. *United States,* 125 F. 2d 895.

that the mails would then be used to obtain the fruits of the fraud. And I do not see why the fraud fails to become a federal offense merely because the collecting bank cashes the checks. That would seem to be irrelevant under these circumstances. As pointed out in *Decker* v. *United States*, 140 F. 2d 378, 379, the object of the scheme was to defraud Triumph; and the use of the mails was an essential step to that end. It is true that the collecting bank was a holder in due course against whom the drawer had no defense. But that does not mean that the fraudulent scheme had reached fruition at that point of time. Yet if legal technicalities rather than practical considerations are to decide that question it should be noted that the defendants were payee-indorsers of the checks. They had received only a conditional credit, or payment as the case may be. It took payment by the drawee to discharge them from their liability as indorsers. Not until then would the defendants receive irrevocably the proceeds of their fraud.

Moreover, this was not the last step in the fraudulent scheme. It was a continuing venture. Smooth clearances of the checks were essential lest these intermediate dividends be interrupted and the conspirators be called upon to disgorge. Different considerations would be applicable if we were dealing with incidental mailings. But we are not. To obtain money was the sole object of this fraud. The use of the mails was crucial to the total success of the fraudulent project. We are not justified in chopping up the vital banking phase of the scheme into segments and isolating one part from the others. That would be warranted if the scheme were to defraud the collecting bank. But it is plain that these plans had a wider reach and that but for the use of the mails they would not have been finally consummated.