**UNITED STATES of America,**

v.

**Alexander L. GUTERMA, Garland L. Culpepper, Jr., Robert J. Eveleigh, Virgil D. Dardi, Chatham Corporation, and Comficor, Inc., Defendants.**

**Cr. No. 45999.**

United States District Court
E. D. New York.

Dec. 16, 1959.

See also D.C., 179 F.Supp. 417.

Moss, Wels & Marcus, New York City, Richard H. Wels and James L. Adler, Jr., New York City, of counsel, for Alexander L. Guterma, for the motion.

Cornelius W. Wickersham, Jr., U. S. Atty. for the Eastern Dist. of New York, Brooklyn, N. Y., Richard B. Cooper, Asst. U. S. Atty., Brooklyn, N. Y. of counsel, in opposition.

BYERS, District Judge.

The defendant Guterma seeks by this motion a dismissal of the indictment in this case, consisting of twenty-six counts, against him as to Counts 1 to 4 inclusive, 7 to 11 inclusive, 16, and 18 to 26 inclusive.

There are several categories of alleged offenses comprehended in the indictment, as to which some understanding should be stated at the outset.

### First Category.

#### (Greenport Bank Stock.)

The first six counts have to do with the purchase by the Bon Ami Company (to be called Bon Ami) of 678 shares of stock of the First National Bank of Greenport, at the ostensible price of $524,600, the actual price being $400,000, and the difference of $124,600 is said to have been eventually received by the defendant Guterma individually, and so retained. This transaction is characterized as a scheme and artifice to defraud Bon Ami, the dates involved being May 1, 1956 and May 7, 1957.

During that period the defendant Guterma was a director, chairman of the board of directors and an executive officer of Bon Ami, whereby he owed a duty of loyalty to protect the financial interests of Bon Ami and its stockholders, which duty he violated.

This transaction is described as a scheme and artifice to defraud Bon Ami, through false pretenses and representations as to the purchase price of the stock; this involved causing the books of account of the company to reflect the purchase price at the higher sum above stated while Guterma knew the actual

cost; and the misappropriation by him of the difference.

As a part of the said scheme that Bon Ami would borrow $250,000 on August 23, 1956 from the Security National Bank to effect the stock purchase; that Bon Ami's check for $524,600 dated August 23, 1956 would be issued payable to the said bank, and that the latter under instructions from this defendant, would disburse the entire sum as follows:

| | |
|---|---:|
| To the Selling Shareholders | $347,000.00 |
| To Parker J. Lynch, for commissions in connection with the said sale | 32,000.00 |
| For the account of George A. Heaney | 21,000.00 |
| Five cashier's checks payable to one Louis Levin, who was not the owner of any of the said stock, nor entitled to any of the proceeds, totalling | 124,600.00 |
| | $524,600.00 |

That a part of the scheme was that Guterma would cause the last mentioned five checks to be transported to Montreal, Canada, there to be cashed and the proceeds to be transported and delivered to Guterma in New York; also that Guterma would conceal from the auditors of Bon Ami and the stockholders of that company, the full facts involved. It is alleged (Count One, Para. 7) that on or about April 5, 1957, Guterma "for the purpose of executing such scheme and artifice to defraud, knowingly caused to be delivered by mail, * * * a letter * * * to wit: The annual report of the Bon Ami Company for the year 1956, addressed to Anthony Musto, 659 Metropolitan Avenue, Brooklyn, New York, at the place at which it was addressed, within the Eastern District of New York."

Counts Two and Three involve similar mailings on the same date to Erben A. Jenkins and Mrs. Elizabeth Halko.

Count Four alleges that for the purpose of executing the same scheme, etc., on September 4, 1956 Guterma mailed a letter from Security National Bank addressed to Lehrich, Secretary of Bon Ami, which letter acknowledged receipt of the check for $524,600 in payment of the said stock.

Count Five (three paragraphs) is that on August 23, 1956 Guterma caused Bon Ami to purchase the said stock, and to issue the said check, representing to the directors, officers, etc. of Bon Ami that the cost was as heretofore stated, and that he did cause the Security National Bank to issue cashier's checks as above tabulated, and that on August 29, 1956, knowing that the five checks totalling $124,600 payable to Levin had been taken by fraud from Bon Ami, "willfully caused the aforesaid checks to be transported in interstate and foreign commerce from the Eastern District of New York to Montreal, Canada."

Count Six is that Guterma, with knowledge of the foregoing, caused the said checks to be cashed in Canada, and the proceeds amounting "to approximately One Hundred Twenty-four Thousand Dollars ($124,000) in United States currency to be transported back from Canada to the Eastern District of New York for delivery to the defendant, Alexander L. Guterma, on or about August 31, 1956."

These offenses are said to violate the following statutes:

Title 18 U.S.C. §§ 2 and 1341 (Mail Fraud);

Title 18 U.S.C. §§ 2 and 2314 (Transportation of Stolen Monies).

This motion is addressed to the first four counts of this category and therefore questions the applicability of the mail fraud statute thereto. The subject will be discussed below.

### Second Category.

#### (Chatco Stock.)

The counts involved are Seven to Eleven inclusive, and the defendants implicated are Guterma and Eveleigh.

Count Seven involves the purported sale of 16,200 shares of Chatco Steel Products, Ltd. to Nevco, Inc. The period is the same; in addition to Guterma's

official status, it is asserted that between the same dates the defendant Eveleigh was a director of the Bon Ami Company and Treasurer, and owed a like duty to protect the financial interests of the company and its stockholders.

Paragraph three covers the period between November 9, 1956 and May 7, 1957 and alleges that these same defendants devised a scheme to defraud Bon Ami and its stockholders and to obtain for their own use and benefit money and property of Bon Ami by false and fraudulent representations and pretenses, namely, to purport to sell on November 16 to 19, 1956 to Nevco, Inc., 16,200 shares of the common stock of Chatco Steel Products, Ltd. (to be called Chatco) which cost Bon Ami $249,608.79, and after trading in the Chatco stock had been suspended by the Toronto Stock Exchange; the purpose to deceive and defraud is said to have been shown in the conduct of these defendants "by falsely making it appear to the auditors of the books and to the stockholders of The Bon Ami Company that the aforesaid Chatco stock had been sold to Nevco, Inc., for Two Hundred Fifty Thousand Dollars ($250,000), and that The Bon Ami Company had received One Hundred Fifty Thousand Dollars ($150,000) cash proceeds of such sale, whereas in truth and in fact there was no bona fide sale to Nevco, Inc., of the Chatco stock, and on December 31, 1956 The Bon Ami Company still owned such Chatco stock."

That it was part of the said scheme that Guterma would cause Nevco to be incorporated in New York on December 27, 1956, and that he would arrange at about that date for Security National Bank to loan Nevco, and for the latter to borrow from it, the sum of $150,000 "on the deposit as collateral for said loan of Six Hundred Seventy-eight (678) shares of the common stock of the First National Bank of Greenport, Long Island, New York, owned by The Bon Ami Company."

Further that the proceeds of that loan were to be deposited to the credit of Nevco in the same bank on December 28, 1956, and that "Saul S. Nevins, as President, would draw a check on the account of Nevco, Inc., payable to The Bon Ami Company for One Hundred Fifty Thousand Dollars ($150,000), which check he would deposit in the account of The Bon Ami Company at the Security National Bank."

Further that on January 15, 1957 Virgil D. Dardi (a defendant) for Bon Ami, and said Nevins as President of Nevco, Inc., "would execute a contract predated, as of December 27, 1956, at the instance, request and command of the defendants, Alexander L. Guterma and Robert J. Eveleigh, stating that The Bon Ami Company had sold to Nevco, Inc., and Nevco, Inc., had purchased for Two Hundred Fifty Thousand Dollars ($250,000), Sixteen Thousand Two Hundred (16,200) shares of the capital stock of Chatco Steel Products, Ltd., owned by The Bon Ami Company, for One Hundred Fifty Thousand Dollars ($150,000) in cash at the date of the transaction, i. e., December 27, 1956, with the balance of One Hundred Thousand Dollars ($100,000) evidenced by a promissory note in the amount of One Hundred Thousand Dollars ($100,000), payable ninety days thereafter with interest at the rate of six per cent per annum."

Further that these defendants would falsely, etc. misrepresent to the auditors of Bon Ami that the said 678 shares of First National Bank of Greenport stock "had not been pledged on December 31, 1956, and that the financial statements in the annual report to the stockholders for the year 1956 would be incomplete, false and misleading, in that they would not show that One Hundred Fifty Thousand ($150,000) Dollars cash had been received on the hypothecation of the Six Hundred Seventy-eight (678) shares of the stock of the First National Bank of Greenport."

That on December 27, 1956 the defendants Guterma and Eveleigh, for the purpose of executing the scheme, made a telephone call from the defendant Guterma in Florida, to George A. Heaney at

the Security National Bank. The statute cited in this connection, in addition to the aiding and abetting statute, is Title 18 U.S.C. § 1343 (which in effect extends the mail fraud statute to cover telephone and other forms of communication in interstate and foreign commerce.)

The motion to dismiss is directed to this count and will be discussed below.

Count Eight is addressed to the same alleged scheme and involves a letter dated February 21, 1957 addressed to Peat, Marwick, Mitchell & Co., 70 Pine Street, New York, confirming that the said 678 shares of Greenport Bank stock were held by the Security National Bank in safekeeping for Bon Ami "and were not subject to any liens, claims, warranties or guarantees direct or contingent." (Mail fraud statute involved.)

Counts Nine, Ten and Eleven involve mailings on April 5, 1957 of a copy of the annual report of Bon Ami for the year 1956 to Musto, Jenkins and Halko referred to above.

The only relation between these two categories is the reference to the use of the Greenport Bank stock as collateral for the loan involving the purchase of the Chatco stock; otherwise the two alleged offenses are unrelated.

### Third Category.

#### (Sale of Greenport Bank Stock.)

Count Twelve avers in detail the sale of the said 678 shares as follows:

That on or about January 25, 1957 Guterma and Eveleigh in violation of their corporate duties and the defendant Culpepper, Jr., who was president of Hazelhurst Corporation, devised a scheme to defraud Bon Ami and its stockholders "and to obtain by means of false pretenses and fraudulent representations for their use and benefit and for the benefit of others not entitled thereto, from The Bon Ami Company, approximately three hundred forty-five thousand dollars ($345,000), the money and property of The Bon Ami Company, which scheme

and artifice was more particularly as follows:"

That Bon Ami would sell the Greenport stock and Guterma and Eveleigh would falsely represent on the Bon Ami books that such sale was for $500,000 while in truth the actual figure was $525,450, and that Bon Ami received only $485,000.

Further that the three named defendants would cause $559,350 "received from the sale of the Greenport Bank stock to be deposited in the account of Hazelhurst Corporation at the Security National Bank and that of such funds four hundred eighty-five thousand dollars ($485,000) would be transferred to the account of The Bon Ami Company at the Security National Bank in payment for the stock sold." Incidentally the mention of $559,350 first occurs in the fifth paragraph of this count and is not presently understood.

A further part of the scheme ostensibly allocates the difference between $485,000 actually received by Bon Ami and the $525,450 above referred to (which is $40,450) to two checks for $15,000 each, one payable to Louis Levin and the other in which the payee is not named (which was to be considered by the defendants as repayment by Hazelhurst of a loan then owing to Levin), and $10,450 which was caused "to be treated as the property of Hazelhurst Corporation and to be disbursed for the personal use and benefit of the defendant, Garland L. Culpepper, Jr., and others, despite the fact that neither the defendant Garland L. Culpepper, Jr. nor Hazelhurst Corporation were entitled to any of the proceeds of the sale of the Greenport Bank stock."

Further that $305,000 (presumably deducted from the $485,000 above referred to) would be transferred from the Bon Ami account in the Security National Bank to the account of U. S. Totalisator Corp., in the Manufacturers Trust Company, from which $300,000 would be in

turn transferred to the Security National Bank,

$150,000 thereof to the account of Anita McGrath Guterma,

$100,000 to the account of Alexander L. Guterma, and

$ 50,000 to the account of Robert J. Eveleigh.

Meanwhile the sale of the Greenport Bank stock was not to be fully disclosed until April, 1957.

Seemingly the period embraced in this count begins January 25, 1957 and ends in April, 1957.

The mail fraud aspect in this series of transactions is said to have been involved on or about February 1, 1957 in the mailing to and delivery at Huntington, Long Island, of "a credit advice from the Manufacturers Trust Company, confirming that $100,000 had been transferred to the Security National Bank for the account of Alexander L. Guterma by the order of U. S. Totalisator Corp."

It will be seen that the sale of the Greenport stock is a transaction quite apart from its acquisition, and the alleged diversion from Bon Ami to Guterma and others of a portion of the sales price has no relation to the matters comprehended in the first two categories of the indictment.

### Fourth Category.

#### (Acquisition of Television Time.)

Count Thirteen brings in Virgil D. Dardi and Chatham Corporation and Comficor, Inc. included in the above list of defendants.

There is averred an intricate series of transactions between March 1, 1957 and May 7, 1957 concerning the acquisition of television time for and on behalf of Bon Ami at an ostensible price which greatly exceeded the actual contract price which was agreed to be paid, but which involved a profit to Guterma in excess of $500,000.

This is a prolix count of sixteen paragraphs, of which the first three contain reference to the official status in Bon Ami of Dardi, as a director from May 1, 1956 to July 17, 1958; chairman of the executive committee on the latter date and on April 25, 1957 to July 17, 1958 he was president; also chairman of the board of directors from May 7, 1957 to July 17, 1958.

Guterma was director and chairman of the board of directors and a member of the executive committee of Bon Ami from May 1, 1956 to May 7, 1957; Eveleigh was a director and treasurer of the company from May 1, 1956 through May 7, 1957.

Paragraphs 4 and 5 recite the advance by Bon Ami of $115,000 to Matthew Fox who gave his note to the company for that amount, which was due April 26, 1957; that the note was secured by collateral being what is called a promise of Guild Films, Inc. to furnish free to Bon Ami $350,000 of television time; that there was default in the payment of the note, in lieu of which Fox offered an additional $150,000 of television time, thus increasing the collateral to $500,000.

Paragraph 6 charges the three above-named defendants and Comficor, Inc. and Chatham Corporation with devising a scheme to defraud Bon Ami by means of false pretenses and representations.

Paragraphs 7, 8, 9, 10, 11, 12, 13, 14 (subd. a, b and c) contain recitals of various steps contemplated by the said scheme, too involved to be summarily stated.

Paragraph 15 alleges that it was part of the scheme that these three individual defendants would conceal from the auditors and stockholders of Bon Ami the various steps taken in behalf of the scheme (subd. a to e inclusive).

Paragraph 16 alleges that on October 15, 1957 the individual defendants and Chatham Corporation and Comficor, Inc., in order to execute the scheme, caused a letter containing a note of Bon Ami in the amount of $130,000 payable to defendant Chatham Corporation to be delivered by the Post Office Department to Security National Bank in Huntington. There seems to be a conflict as to

the amount of that note between the averments of paragraph 13 (which refers to a $100,000 note of Bon Ami payable to Chatham) and the amount stated in paragraph 16.

This entire count is difficult to follow in reading, and I doubt very much if a jury could hope to understand and trace the intricate series of maneuvers sought to be indicated in this section of the indictment.

The gist of the offense seems to be indicated in subdivisions c, d and e of paragraph 15, namely that Guterma, Chatham and Comficor realized a profit of approximately $513,000 on "the aforesaid contract of June 20, 1957" which contract is referred to in subdivision a of that paragraph. Also as stated in subdivision d, that the television time purchased by Bon Ami from Chatham could have been purchased directly from Guild Films Company "at a substantially lower price than the $830,000 paid to Chatham Corporation."

It will be observed that this involves a mail fraud count as stated in paragraph 16.

Count Fourteen alleges that on October 21, 1957 at Huntington, the individual defendants and Chatham and Comficor caused to be placed in a post office a letter containing Security National Bank's cashier's check No. 1–6942 in the amount of $131,722, representing payment by Bon Ami of the note referred to in paragraph 16 of Count Thirteen, with interest. This is again a mail fraud count.

Count Fifteen alleges a mailing on December 23, 1957 on the part of the same defendants and for the same purpose of a letter containing Security National Bank's cashier's check No. 1–8348 in the amount of $102,000, representing the payment, with interest, of one of the $100,000 notes described in paragraph 14c of Count Thirteen.

This motion is not addressed to Counts Twelve to Fifteen inclusive.

Counts Sixteen to Nineteen inclusive allege a mailing on April 30, 1958 by the same defendants and for the same pur-

pose of a letter containing the annual report of Bon Ami for 1957 to Musto, Alvin D. Coleman and Miriam Coleman, Jenkins and Halko.

These mailings were accomplished nearly a year after the alleged perpetration of the scheme to defraud Bon Ami, in connection with the acquisition of the television time. There is no showing of the elements of concealment of the true facts involved in the contents of the annual report of Bon Ami for the year 1957.

Fifth Category.

(Security National Bank Transactions.)

Count Twenty alleges the status on May 23, 1958 of the Security National Bank, its name and insurance of its deposits by the F.D.I.C.

From the above date through September 4, 1958 that George A. Heaney, not indicted, was the president of said bank.

Paragraph 3 asserts that Guterma "willfully and with full knowledge that George A. Heaney had no authority from the Directors of the Security National Bank to issue the below described obligation of said bank, counselled, commanded, induced, procured and caused * * * George A. Heaney * * *" (within this district) "without authority from the Directors of the Security National Bank, and with intent to injure and defraud the said Bank, to make, issue and put forth an obligation of the Security National Bank," namely, letter to Netherlands Trading Society, committing the bank to purchase from Netherlands a series of eighteen notes of F. L. Jacobs Co., issued August 4, 1958, of $15,000 each.

Count Twenty-one is to the same effect, but refers to a like number of notes of like amounts, issued August 5, 1958.

Count Twenty-two is the same, except that it refers to eighteen notes of $27,500 each, dated August 11, 1958.

Count Twenty-three is of the same nature, but refers to the purchase of eighteen notes of the Scranton Corporation in the sum of $10,000 each, dated August 12, 1958.

Count Twenty-four is of the same nature, but refers to a purchase of a note of the defendant Guterma, in the amount of $250,000 (no date given).

Count Twenty-five is in substance the same but has to do with a letter addressed to Alan Development Corporation committing the bank to honor a sight draft drawn by that corporation on or after September 30, 1958 or not later than October 15, 1958, in any amount "not exceeding Two Hundred and Sixty Thousand Dollars ($260,000)."

Count Twenty-six is substantially the same in form but concerns a letter addressed to Reldan Trading Corp., agreeing to purchase therefrom on or after October 15, 1958 and on or before November 6, 1958, two notes of the Scranton Corporation, each for $400,000.

Counts Twenty to Twenty-six inclusive involve Title 18 U.S.C. § 1005 (which deals with bank entries, reports and transactions).

On the argument it was stated that the substance of the charge against Guterma is that he aided and abetted Heaney to conduct this series of transactions which supposedly were inimical to the bank.

As to Title 18 U.S.C. § 2, the language is:

"(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

"(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

As to the latter, the act could not have been done by Guterma, since he was not an officer of the bank. (But see Phillips v. United States, 9 Cir., 218 F.2d 385.)

It will be seen from the foregoing analysis that the indictment embraces five separate categories of offenses which have no connection one with another; the first four were consistent with a common purpose to loot the treasury of Bon Ami, while the fifth seems to have had for its object a series of transactions on the part of the Security National Bank which could have been disastrous to it. As to these, the same provisions of federal law are not involved as in the first four.

The observations of the court in the case of United States v. Lotsch, 2 Cir., 102 F.2d 35, at page 36, are apposite, touching the joinder of several crimes in one indictment:

"There is indeed always a danger when several crimes are tried together, that the jury may use the evidence cumulatively; that is, that, although so much as would be admissible upon any one of the charges might not have persuaded them of the accused's guilt, the sum of it will convince them as to all."

This is such a case. The various offenses could well have been the subject of separate indictments by reason of the clear identity of each. Count Thirteen contains a difficult and confused series of allegations, which is all the more reason why it should have been presented as a thing apart. No jury should be expected to receive and obtain a clear impression of the conglomeration of charges and the evidence tendered in connection therewith, and yet maintain a detached approach as to each offense when passing upon the evidence as a whole; a ponderous volume of testimony is foreshadowed to support so multifarious a pleading as this indictment shows itself to be.

In this connection it is to be observed that the obvious length of such a trial as is indicated, provides good reason for seeking to cut down the number of court days, if that can be wisely brought about. The subject will be referred to later.

The motion to dismiss presents the important argument that the mail fraud statute does not apply to the mailings which have been pleaded; this motion falls within F.R.Crim.Proc. 12(b), 18 U.S.C. and is addressed to Counts One to Four inclusive; Seven to Ten inclusive; Eleven, Sixteen, Eighteen and Nineteen.

The statute is found in Title 18 U.S.C. § 1341. It may be paraphrased as dealing with one who has devised a scheme for obtaining money or property by false pretenses, who "for the purpose of executing such scheme * * * places in any post office * * * any matter or thing whatever to be sent or delivered by the Post Office Department * * * shall be etc."

The mailings alleged as to the first three counts were on April 5, 1957 of annual reports for 1956 of Bon Ami to three separately named persons. The mailing stated in Count Four on September 4, 1956 will be separately discussed.

As to Count Seven, there was a telephone call involved on December 27, 1956 within Title 18 § 1343 which in effect extends the mail fraud statute to cover such a communication. That will be alluded to below.

Count Eight involves a mailing on February 21, 1957 of a letter addressed to an accounting firm as to the then whereabouts of the 678 shares of Greenport Bank stock. That also will be the subject of later comment.

Counts Nine, Ten and Eleven involve mailings on April 5, 1957 of the 1956 annual report of Bon Ami to the above named Musto, Jenkins and Halko.

Counts Sixteen to Nineteen inclusive involve mailings on April 30, 1958 of a letter containing the annual report of Bon Ami, for the year 1957. In the first three counts the mailing is described as "a letter, to wit: the annual report" (for 1956). In these three the letter is said to contain the report. Whether the difference in verbiage is deliberate does not appear.

These mailings then of the two annual reports are now to be considered together.

For argument it will be assumed that the annual reports for 1956 did not reveal:

(a) The true figures as to the price paid by Bon Ami for the Greenport Bank stock (First category).

(b) The true facts attending the purported sale of the Chatco stock to Nevco (Second category).

(c) The legal status of the 678 shares of Greenport Bank stock as at December 31, 1956, the true figures involved in the sale of that stock, and the diversion of a portion of the proceeds from Bon Ami to Hazelhurst Corporation and others (Third category).

Further it will be assumed that each recipient of a mailing was a stockholder of Bon Ami and became such before the perpetration of the transactions which diverted money from the corporate treasury into the pockets of one or more persons not entitled to any portion thereof. This series of transactions as averred, of course constitute a fraud upon Bon Ami which would seem to challenge the attention of certain state courts.

As to the federal aspect of the matter, since the motion in effect challenges the jurisdiction of this court, the mailing of the annual reports to stockholders requires careful attention.

■ Can it be said that the challenged mailings were accomplished "for the purpose of executing" such schemes?

The purchase of the Greenport Bank stock would seem to have been accomplished by September 4, 1956 (Count Four) when the receipt of the check for $524,600 was acknowledged.

The mailings of the 1956 annual report were on April 5, 1957.

These stockholders were not victims of the scheme in the sense that they had been the subject of previous solicitation or inducement as in the case of Farmer v. United States, 2 Cir., 223 F. 903, cited by the Government. It is true that all of the stockholders would ultimately suffer from the diversion of corporate funds, but the assumed misrepresentations to them were not made as a bait or lure to induce them to become stockholders; at least the indictment does not so allege.

There is no allegation to the effect that the corporation itself took no remedial

steps to reimburse itself—if that were possible—by reason of the said mailings.

Defendant relies upon Kann v. United States, 323 U.S. 88, at page 94, 65 S.Ct. 148, at page 151, 89 L.Ed. 88, in which the following language was used in reversing a conviction under this statute where checks had been cashed as part of such an unlawful scheme, and the mailing of those checks by the banks to the drawees were relied upon by the Government:

"The case is to be distinguished from those where the mails are used prior to, and as one step toward, the receipt of the fruits of the fraud, such as United States v. Kenofskey, 243 U.S. 440, 37 S.Ct. 438, 61 L.Ed. 836. Also to be distinguished are cases where the use of the mails is a means of concealment so that further frauds which are part of the scheme may be perpetrated. In these the mailing has ordinarily had a much closer relation to further fraudulent conduct than has the mere clearing of a check, although it is conceivable that this alone, in some settings, would be enough. The federal mail fraud statute does not purport to reach all frauds, but only those limited instances in which the use of the mails is a part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law."

The cases cited by the Government have been examined and found to involve mailings that were intrinsic to the scheme itself. This is clearly so in Hermansen v. United States, 5 Cir., 228 F.2d 495.

See also, United States v. Riedel, 7 Cir., 126 F.2d 81, at page 83, in which the opinion says:

"The words 'in furtherance of' as applied to the scheme may be established only when the scheme is still in existence."

Davis v. United States, 6 Cir., 125 F.2d 144. The facts are not stated in the opinion; it seems that the letter must have been to a victim, and that the inference from its terms was either a continuance of the fraud, or to aid "in the retention of its fruits, to lull the victim into a false sense of security and to postpone the taking of action with respect to his loss, and to delay discovery."

The facts as alleged here do not fall within the quoted language.

Preeman v. United States, 7 Cir., 244 F. 1, is wide of the facts here involved but it is clear that the court found that the use of the mails was shown to have been essential to the operation of the scheme to defraud.

It has been the effort to explain above that the mailings of the annual report of Bon Ami for the year 1956 to persons named, whose status is not disclosed, cannot be deemed to have been in furtherance of the scheme or plan attributed by Counts One, Two and Three to the defendant Guterma. As to these three counts, the motion is granted.

█ Count Four deals with a letter dated on September 4, 1956 which this defendant is alleged to have caused to be mailed from Security National Bank addressed to the Secretary of Bon Ami, acknowledging receipt of that company's check for $524,600 in payment for the said 678 shares of the said Greenport Bank stock.

Since Bon Ami was the victim of the alleged scheme, the letter was in effect addressed to it; the date was that of the consummation of the scheme, and was clearly calculated to aid in the execution. The motion is denied as to this count.

█ Count Seven falls within the second category above described, namely the purported sale to Nevco, Inc. of the Chatco Steel stock, the time involved being the month of December 1956. A telephone conversation of December 27th is alleged to have been held for the purpose of executing the scheme to defraud. Such a message is the equivalent of a letter and therefore falls directly within Title 18 U.S.C. § 1343, and as to this count the motion is denied.

Count Eight is within the same category and involves a letter said to have been sent on February 27, 1957 addressed to Peat, Marwick, Mitchell & Co., respecting the legal status of the 678 shares of Greenport Bank stock as then being held for safekeeping instead of as collateral, in connection with the purported dealing in the Chatco stock.

 While that mailing occurred nearly two months after said transaction, it could well have been confirmatory thereof and cannot be ruled out as not having been sent for the purpose of executing the alleged scheme. The motion to dismiss Count Eight is denied.

Counts Nine, Ten and Eleven allege mailings on April 5, 1957 of the annual report of Bon Ami for the year 1956 to Musto, Jenkins and Halko. For the reasons above discussed in connection with Counts One, Two and Three, it does not appear that these mailings can be said to have been for the purpose of executing the scheme as to the Chatco stock. As to them, the motion is granted.

Dismissal is sought as to Counts Sixteen, Eighteen and Nineteen, dealing with matters embraced in the fourth category. (The acquisition of television time.)

The mailings were:

Count Sixteen, April 30, 1958 (letter) annual report of Bon Ami for the year 1957 to Musto;

Count Eighteen, ditto to Jenkins;

Count Nineteen, ditto to Halko.

For the reasons which have been discussed in connection with Counts One, Two and Three, it cannot be seen how the details of the intricate transactions involved in category fourth can be said to have been concealed in the annual report of Bon Ami for the year 1957, and consequently these mailings are not deemed to have been for the purpose of executing the scheme to defraud. Therefore as to them, the motion to dismiss is granted.

Concerning Counts Twenty to Twenty-six inclusive embraced in the fifth category, which has to do with the affairs of the Security National Bank as above described, it appears that the defendant Guterma is the subject of this indictment in that he aided and abetted Heaney to conduct a series of transactions which are assumed to have been inimical to the interests of the Security National Bank.

The motion is based on the theory that those transactions constituted a single course of conduct, such as was discussed in United States v. Universal C. I. T. Credit Corp., 344 U.S. 218, 73 S.Ct. 227, 97 L.Ed. 260, and United States v. Personal Finance Co., D.C., 174 F.Supp. 871. The statute involved in these counts is Title 18 U.S.C. §§ 1005 and 2.

An analysis of this indictment does not sustain this argument. Each of the matters alleged in these counts was a separate transaction, and in the opinion presently held these did not constitute a course of conduct within the reasoning of the opinions to which reference has been made.

The Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq. and the Defense Production Act, 50 U.S.C.A.Appendix, § 2061 et seq. which were before the court in the cited cases, were held to envisage a course of conduct. The opinion in the former contains this statement (334 U.S. at page 224, 73 S.Ct. at page 231):

"The offense made punishable under the Fair Labor Standards Act is a course of conduct. Such a reading of the statute compendiously treats as one offense all violations that arise from that singleness of thought, purpose or action, which may be deemed a single 'impulse,' a conception recognized by this Court in the Blockburger case, supra [Blockburger v. United States, 284 U.S. 299, at page 302, 52 S.Ct. 180, at page 181, 76 L.Ed. 306], quoting Wharton's Criminal Law, 11th ed. § 34."

The statute here in point refers to an officer of a bank, who without authority makes, draws, issues or puts forth an obligation of the bank, etc. Counts Twenty, Twenty-one and Twenty-two refer to purchases on three separate

dates of F. L. Jacobs Co. notes. Twenty-three to a purchase on another date of Scranton Corporation notes. Twenty-four to the purchase of a Guterma note on an undisclosed date. Twenty-five to the honor of a sight draft of Alan Development Corporation. Twenty-six to a purchase between October 15, 1958 and November 6, 1958 of two notes of Scranton Corporation.

While there may be a singleness of purpose disclosed to jeopardize the affairs of the Security National Bank, the impulses were plural and were manifested at different times and in different ways. Obviously different elements of proof are required as to many, if not all, of the offenses charged.

To characterize these separate transactions as a course of conduct such as was said to be envisioned in the statutes discussed in the cited cases, would be so strained as to be patently unrealistic.

As to Counts Twenty to Twenty-six, the motion is denied.

There remains to be considered the function of the court under F.R.Crim. Proc. 14, in dealing with this indictment.

The logical presentation of the case calls for separate trials as to the first and third categories above set forth, i. e., the purchase and sale of the Greenport Bank stock. Those two counts, while involving different elements of proof, can be heard and disposed of conveniently in one trial.

The matter of the Chatco stock involves proof unrelated to the acquisition and sale of the Greenport Bank stock, and should be separately tried.

The fourth category, involving the acquisition of television time, has no true relation to other matters, and will involve so complex a presentation of proof that it is clearly required to be presented as one distinct offense.

The same comment covers the transactions having to do with the Security National Bank, above discussed. Why its affairs should have been deemed appropriate for consideration in the trial involving the apparent looting of the treasury of Bon Ami, has escaped the understanding of this court.

The order to be entered on this decision is to be settled on notice, and is to contain appropriate provisions pertaining to the subject last above discussed, as well as any matters still open, arising under Rule 16.