Donald Paul **EASTER**, Appellant,

v.

**UNITED STATES of America,**
**Appellee.**

No. 20464.

United States Court of Appeals,
Eighth Circuit.

April 15, 1971.

Harold G. DeKay, Atlantic, Iowa, for appellant.

Allen L. Donielson, U. S. Atty., John B. Grier, Asst. U. S. Atty., Des Moines, Iowa, for appellee.

Before MATTHES, Chief Judge, Mr. Justice CLARK,* and BRIGHT, Circuit Judge.

CLARK, Associate Justice.

The appellant, Donald Paul Easter, has been found guilty by a jury on 13 counts of mail fraud, in violation of 18 U.S.C. § 1341.[1] On this appeal he contends that the evidence was insufficient to show a scheme to defraud; that the mailings were not shown to have been part of or in execution of the scheme; that certain counts are based on mailings subsequent to the receipt of the fruits of the fraud; and that an instruction on circumstantial evidence was erroneous, and another instruction on Iowa Law took factual issues from the jury, denying appellant due process. We find no merit in any of the contentions and affirm the judgment.

█ 1. The evidence is clear and convincing that appellant devised a scheme to defraud and obtain money by false pretenses, representations and promises and that he used the United States mail to execute the same. The gist of the offense is that appellant personally solicited funds from around two hundred people on a pre-subscription agreement to purchase stock in a corporation to be subsequently organized and to be known as Educational Investment Corporation. He represented that the corporation would earn high returns on the purchase of contracts of students with educational institutions, correspondence schools etc.; that the corporation would be organized when $100,000 had been raised; and that appellant was to receive up to 20 percent organizing fees. In his plan of operation appellant called on Elmer Bergantzel, a 30-year resident farmer of the community, whom he had met through the minister of the Christian Church. Bergantzel was made acting vice president of E.I.C. by appellant and was induced to subscribe with his wife to shares of stock. Appellant advised them that a charter would be secured when $100,000 was raised and that the corporation should earn interest up to 40 percent.[2] In addition, appellant employed Mrs. Bergantzel as his bookkeeper and having decided that there should be two signatures to the corporate checking accounts, induced Bergantzel to be a cosigner with appellant. He also secured a list of "investment conscious" friends whom Bergantzel recommended for solicitation. Appellant subsequently solicited these people—farmers, laborers, wage earners of both sexes and all ages. As he would secure a subscription—a post-dated check or other payment—he would have the subscriber sign a sub-

* The Honorable Tom C. Clark, retired Associate Justice of the United States Supreme Court, sitting by special designation.

1. The mail fraud statute, 18 U.S.C. § 1341, provides as follows:
"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Post Office Department, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both."

2. Other witnesses testified as to the earnings appellant represented they would make on the E.I.C. stock: "around 11 percent"; "your money would probably triple in about two to three years"; "exceeded anything we could get on money which we had in a savings and loan account"; "somewhere around 30–35 percent"; "18 percent per year"; "well, about 35–36 percent"; "as high as 35 percent"; "maybe up to 40%".

scription list and also secure a list of friends to solicit. The sales pitch appeared to be a reference to who had recommended the prospect, the exhibition of the signed subscription list that appellant carried with him and a sales talk as to earnings, etc. Within slightly over a year appellant had secured $102,000 of subscriptions. However, $25,000 had reneged either on their post-dated checks or subscription which left a total of $77,000 in cash that was collected. The money—for the most part—was deposited in banks or savings and loan associations. On three occasions it appears that appellant cashed the checks at the bank and received the money himself. These are covered by Counts I, VIII and XVII. No corporate charter was ever applied for by the appellant nor did one ever issue for the E.I.C. On the other hand, the appellant changed the original target amount for a charter from $100,000 to $200,000 without even advising the previous subscribers. In addition, appellant had induced Bergantzel to sign series of blank checks and to sign blank bank and loan association signature cards which permitted appellant to withdraw funds on his sole signature. This appellant did. In fact one exhibit indicates that appellant planned at the inception to take $30,000 personally in promotion fees during the first year and to pay an item marked "Folks debt" of $5000 to his parents on April 15, 1966. The evidence is that he personally drew over $34,000 from the accounts during the period of some 15 months. Checks to himself and marked "promotion fee" totaled $21,000, $6474.96 were marked "commissions" and over $5000 for "expenses." We find the evidence overwhelming that from its very inception the appellant devised a scheme to defraud and successfully carried it out See Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); Kayser v. United States, 394 F.2d 601 (8 C.A. 1968); Latham v. United States, 407 F.2d 1 (8 C.A. 1969).

■ 2. The evidence is also clear and abundant that the mails were used to ex-

ecute the scheme. On all of the counts save three the checks were deposited to the corporate account and cleared by mailing to other banks. See Pereira v. United States, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954). In addition, the appellant followed a course of conduct, traditional to mail fraud of writing "lulling letters" to his victims. Typical letters advised the addressee: "We have made fine progress * * * we have raised $81,000 * * * In time you will discover that you have made a very wise investment. Your check for $500 (100 shares) will be deposited on 6-1-66." At no time had $81,000 been raised. Another letter—practically identical—except the amount raised was represented as $140,000—covered 200 shares. And still another letter of the same type represented that "we have raised $160,000." It covered 50 shares. These mailings take the case out of the rule of Kann v. United States, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944), placing it clearly within the exceptions there noted at p. 94, 65 S.Ct. 148. Moreover, even though the rule announced in *Kann* did apply, this would only affect three of the counts and since the sentences were concurrent the result would remain unchanged. See United States v. Sheehan, 428 F.2d 67, 80 (8 C. A. 1970).

■ 3. Nor is there merit in the attack on the circumstantial evidence charge (Instruction No. 5). See Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954) at 140; United States v. Kye, 411 F.2d 120 (8 C.A. 1969). Indeed, if there were it would be harmless in view of the abundance of direct proof.

■ 4. Finally, the appellant objects to Instruction No. 7 as to Iowa Law. It was entirely proper. Appellant had admitted to pleading guilty to a charge of selling securities to more than 25 persons without complying with Iowa law and was fined $500.00. The court merely took judicial notice of Iowa law with reference to pre-incorporation agreements and the maximum commissions

428

and expenses permitted i.e. 20%. The testimony had shown payments to appellant of almost 50% of the cash received and over ⅓ of the total subscriptions. We note that the learned trial judge carefully explained that no charge was made here of a violation of Iowa law but that the instruction was given only if the jury found it relevant as to representation made by appellant to prospective subscribers.

The judgment is affirmed.