Revised August 12, 1998

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

**No. 97-10292**

---

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**VERSUS**

**CYNTHIA BENNETT EVANS,**
**also known as Cindy,**

**Defendant-Appellant.**

---

Appeal from the United States District Court
for the Northern District of Texas

---

July 24, 1998

Before REAVLEY, DeMOSS, and PARKER, Circuit Judges.

DeMOSS, Circuit Judge:

Cynthia Bennett Evans appeals from her conviction and sentence on charges of mail fraud under 18 U.S.C. § 1341. Because the alleged mailings did not, as the statute requires, serve Evans's purpose of executing her scheme to defraud her employer of her honest and faithful services, we reverse the mail fraud convictions

and vacate that sentence.  The judgment of the district court is in all other aspects affirmed.

**I.**

Cynthia Evans was employed as a parole officer for the Board of Pardons and Paroles of the Texas Department of Criminal Justice.[1]  She worked out of an office in Fort Worth, Texas.  In her official capacity, Evans supervised parolees and was responsible for making decisions and recommendations concerning them.

Among the parolees supervised by Evans was a drug dealer named John Clay, a/k/a Cold Blooded.[2]  Clay had been released on parole after serving four years of a forty-year sentence for drug-related offenses.  Immediately upon his release into Evans's supervision, Clay borrowed $10,000 from a friend and started dealing crack cocaine.  He quickly ran into potential trouble, however, by failing two consecutive drug tests conducted at the parole office.  Clay twice tested positive for cocaine, and because he was not using cocaine at the time, he reasoned that he must have been

---

[1]  The Texas Department of Criminal Justice is a department of the State of Texas.  The Board of Pardons and Paroles is a division of the Texas Department of Criminal Justice.

[2]  At trial it was suggested that Clay had murdered a man in Fort Worth's Como neighborhood and had thereby earned the nickname "Cold Blooded" for his propensity for violence.  Clay insisted, however, that when he "used to go in the gambling shack and shoot the dice," he would holler "oh, cold blooded," and everyone just started using that as his name.

absorbing the drug through his skin during the process of converting powder cocaine into crack. He decided that he needed to get Evans on his "team."

According to Clay, at the beginning of his relationship with Evans, she was a "very strict" parole officer who "played always by the book." Recognizing, however, that he would be sent back to prison if he continued to fail drug tests, Clay began trying to bribe Evans. She resisted his first attempt. While Evans was visiting him in the field, Clay offered to buy "some rims for her car." Evans declined the offer and threatened to report any future bribery attempts by Clay. He persisted. During a subsequent visit to the parole office, Clay told Evans: "What I'm going to do when I get up is drop some money behind me, and you can either pick it up and report it to lost and found, or you can go get your hair and nails done." Clay dropped $100 on the floor, and when he made an appointment for his next visit to the parole office, Evans thanked him for her hair and nails.

Evans and Clay developed a number of ways to evade the reporting and testing requirements of Clay's parole. To circumvent the drug-testing requirement, Evans suggested that Clay come to the parole office very early, before the arrival of any male officers who could supervise the collection of Clay's urine sample. Clay would then put water in the cup. If there was a supervisor present and Clay had to actually provide a urine sample, he would not seal the package and he would then tell Evans that the sample was

"dirty" so that she could make some arrangement to avoid a positive result.

After the first bribe, Clay would leave with Evans a bribe of $100-$300 on each monthly visit. Then, after three or four months, Evans began asking for more money. Clay began paying her bribes of up to $700 at a time. Often, the payments were made to cover specific items requested by Evans: a television receiver, eyelid tattoos that resembled eyeliner, limousine rental, a honeymoon. He also provided Evans with drugs and paid for her car to be washed. Clay estimated that he ultimately paid up to $25,000 in bribes to Evans, including about $8,000 for Evans's wedding.

Clay and Evans also developed a personal relationship. Clay would provide drugs to Evans, and they used drugs together at times. They also began having sexual relations after about six months. The two would meet often for lunch or dinner and other occasions, such as when Clay joined Evans and her son for the Fourth of July. A supervisor in Evans's office testified that these sorts of personal contacts with parolees are improper.

By virtue of the relationship established with Evans, Clay was able to violate routinely the conditions of his parole. He smoked marijuana and used cocaine once or twice a month while under Evans's supervision. He would travel across the country (for example, to watch the Dallas Cowboys win Super Bowl XXX in Phoenix, Arizona) and out of the country (for example, to the Bahamas, Nassau, and Jamaica on ocean cruises) without obtaining official

approval.  And, most significantly, he sold crack cocaine to over a thousand customers across several states.  Evans knew of all these parole violations, yet she failed to report them as her job required.

One of Evans's duties as a parole officer was to visit parolees at their places of residence and employment.  The State of Texas pays the travel expenses for these trips.  The parole officers keep a log of their visits with each parolee (referred to as a "chronological record"), and they submit travel vouchers for reimbursement from the state.  Evans falsely recorded required visits in Clay's record which were never made.[3]  She also turned in false travel vouchers, which were in turn mailed to Austin, Texas, for processing.  Testimony at trial established that if entries in a parolee's record failed to reconcile with the parole officer's submitted travel vouchers, this irregularity would raise a red flag and invite closer scrutiny by a supervisor.

A federal investigation of Clay's drug syndicate resulted in the discovery of Clay's arrangement with Evans.  Evans was named as a defendant in a multiple-defendant indictment covering the entire scope of Clay's operations.  She was charged with aiding and abetting a conspiracy to distribute cocaine and cocaine base.  A superseding indictment against Evans alone charged her with

---

[3]  For example, she falsely indicated that she had visited Clay at his supposed place of employment, Mr. C's Car Wash, after that business had ceased operations.

extortion and mail fraud.  A jury convicted her on all counts, and she was sentenced to seventy-two months of imprisonment.  Evans timely appealed, contesting the sufficiency of the evidence to support the convictions and the district court's upward departure from the Sentencing Guidelines.

## II.

In counts seven through eleven of the superseding indictment, Evans stands accused of violating the federal mail fraud statute.[4] Evans contends that the evidence presented by the government is insufficient as a matter of law because it fails to establish that

---

[4]  The statute provides, in pertinent part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud . . . *for the purpose of executing such scheme or artifice or attempting so to do*, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 1341 (emphasis supplied); *see also* 18 U.S.C. § 1346 ("For the purposes of this chapter, the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services.").

the alleged mailings were "for the purpose" of perpetuating a fraud. 18 U.S.C. § 1341; *see **United States v. Vontsteen***, 872 F.2d 626, 628 (5th Cir. 1989). We agree.

As required by FED. R. CRIM. P. 7(c)(1), the superseding indictment recites the following essential facts constituting the offense charged:

### 2. <u>**THE SCHEME**</u>

From on or about February 17, 1994, and continuing through on or about February 29, 1996, in the Northern District of Texas and elsewhere, **CYNTHIA BENNETT EVANS**, defendant, knowingly and willfully devised and intended to devise a scheme to defraud the Board of Pardons and Paroles of the Texas Department of Criminal Justice and the citizens of the State of Texas[5] of her honest and faithful services by using her knowledge, authority and official position as a parole officer to assist John Clay, who is not named as a Defendant herein, in avoiding arrest and incarceration for violating conditions of parole.

### 3. <u>**ACTS IN FURTHERANCE OF THE SCHEME**</u>

(A) It was a part of the scheme that **CYNTHIA BENNETT EVANS**, defendant, would agree to submit or cause to be submitted falsified urine specimens for John Clay to a laboratory for analysis for the presence of illegal controlled substances.

(B) It was a further part of the scheme that **CYNTHIA BENNETT EVANS**, defendant, would make false and incomplete entries into the business records of

---

[5] To the extent that the indictment accuses Evans of depriving "the citizens of the State of Texas of her honest and faithful services," we note that any such scheme cannot be prosecuted under the federal mail fraud statute, as "the rights of citizens to honest government have no purchase independent of rights and duties locatable in state law." ***United States v. Brumley***, 116 F.3d 728, 735 (5th Cir.) (en banc), *cert. denied*, 118 S. Ct. 625 (1997).

-7-

the Board of Pardons and Paroles to conceal information regarding activities of John Clay which constituted violations of conditions of parole.

(C)  It was a further part of the scheme that **CYNTHIA BENNETT EVANS**, defendant, would make entries or cause entries to be made into the business records of the Board of Pardons and Paroles indicating that **CYNTHIA BENNETT EVANS**, defendant, made periodic visits to John Clay's place of employment and place of residence.

(D)  It was a further part of the scheme that **CYNTHIA BENNETT EVANS**, defendant, would agree to and did provide John Clay with information obtained through her employment as a parole officer regarding other individuals and associates of John Clay who were on parole.

(E)  It was a further part of the scheme that when **CYNTHIA BENNETT EVANS**, defendant, was contacted by telephone by an individual known to the grand jury, on or about January 10, 1996, regarding possible illegal activity of John Clay, **CYNTHIA BENNETT EVANS** told that person that John Clay was an automobile salesman, when **CYNTHIA BENNETT EVANS** knew that John Clay was not employed as an automobile salesman.

(F)  It was a further part of the scheme that, beginning in or about February of 1994 and continuing through on or about February of 1996, **CYNTHIA BENNETT EVANS**, defendant, would agree to and did accept payments in cash from John Clay.

(G)  It was a further part of the scheme that, beginning in or about February of 1994 and continuing through on or about February of 1996, **CYNTHIA BENNETT EVANS**, defendant, would agree to and did accept property and other benefits from John Clay, including: window tinting for her personal automobile, a television set, and the use of a rented limousine.

(H)  It was a further part of the scheme that, beginning in or about February of 1994 and continuing through on or about February of 1996, **CYNTHIA BENNETT EVANS**, defendant, would agree to

> and did accept marihuana and cocaine from John
> Clay.

The preceding language was incorporated by reference into each of five mail fraud counts, each representing a separate instance of Evans filing a travel voucher with her supervisor. Each of the five counts contains the following additional language (altered in each case to reflect the pertinent date):

2. **<u>USE OF THE MAIL</u>**

> For the purpose of executing and attempting to execute the scheme to defraud, **CYNTHIA BENNETT EVANS**, defendant, did knowingly and willfully cause to be placed in an authorized depository for mail matter an envelope addressed to Financial Management, Attention Jerry Wall, 8712 Shoal Creek Boulevard, Suite 100, Austin, Texas 78711, which envelope contained a travel voucher and travel record of **CYNTHIA BENNETT EVANS** dated October 2, 1995, such envelope and contents to be sent and delivered by the United States Postal Service.

At the close of the prosecution's case, Evans moved, pursuant to FED. R. CRIM. P. 29(a), for a judgment of acquittal on all mail fraud counts. In support of that motion, counsel argued that the mailed travel vouchers had "no bearing whatsoever on the level of supervision or whether anything occurs in regard to the parolee's status." The motion was denied. After presenting all of her evidence, Evans renewed her Rule 29 motion, thereby preserving the issue for appeal. It was again denied. Subsequently, following the guilty verdict, Evans once more moved for a judgment of acquittal, this time pursuant to FED. R. CRIM. P. 29(c), specifically arguing that "[t]he Government failed to prove by sufficient

evidence that the mailings as set forth in counts 7 through 11 were 'for the purpose of executing the scheme'" as required by 18 U.S.C. § 1341. Yet again, the district court declined to throw out the mail fraud counts.

These rulings were in error. Judgment of acquittal should have been granted on the mail fraud counts because the government's evidence did not establish that Evans's travel vouchers were mailed in furtherance of her scheme to defraud the State of Texas.

In **Kann v. United States**, 323 U.S. 88, 65 S. Ct. 148 (1944), corporate officers had been convicted for mail fraud based on their fraudulent scheme of setting up a dummy corporation to divert corporate funds to themselves. The theory of prosecution depended upon mailings between banks which took place as a plainly anticipated result of the defendants' acts of cashing fraudulently obtained checks. The Supreme Court reversed the convictions, reasoning that at the time a check was cashed, "[t]he scheme in each case had reached fruition." **Kann**, 323 U.S. at 94, 65 S. Ct. 151. "It cannot be said that the mailings in question were for the purpose of executing the scheme, as the statute requires." **Id.**

Likewise, in **Parr v. United States**, 363 U.S. 370, 80 S. Ct. 1171 (1960), employees of a school district used credit cards to make unauthorized purchases of gasoline. The invoices for the gasoline purchases would be mailed to the school district, which made its payments by returning checks through the mail. As in

*Kann*, the Court concluded that "the scheme . . . had reached fruition" at the time the defendants received the gasoline, and the convictions were reversed. *Parr*, 363 U.S. at 393, 80 S. Ct. at 1184.

This approach was once again applied in *United States v. Maze*, 414 U.S. 395, 94 S. Ct. 645 (1974), in which the defendant had been convicted for mail fraud based on his scheme of using a stolen credit card to buy food and stay at a hotel. The alleged mailings in furtherance of the defendant's scheme were those that would inevitably be made from the merchants to the bank and from the bank to the true owner of the credit card. Relying on the previous holdings in *Kann* and *Parr*, the Supreme Court concluded that the mailings were not sufficiently related to the scheme. The Court noted:

> Congress could have drafted the mail fraud statute so as to require only that the mails be in fact used as a result of the fraudulent scheme. But it did not do this; instead, it required that the use of the mails be "for the purpose of executing such scheme or artifice . . . ."

*Maze*, 414 U.S. at 405, 94 S. Ct. at 651 (footnote omitted).

Finally, we are instructed by this Court's previous decision in *United States v. Vontsteen*, 872 F.2d 626 (5th Cir. 1989), *cert. denied*, 498 U.S. 1074, 111 S. Ct. 801 (1991), *superseded on other grounds*, 950 F.2d 1086 (5th Cir.) (en banc), *cert. denied*, 505 U.S. 1223, 112 S. Ct. 3039 (1992). There, the defendant was employed at

-11-

a company that bought and sold oil field pipe. He caused the company to buy pipe on credit and then resell it. The defendant abused his position by pocketing profits and refusing to pay the original pipe suppliers. He was prosecuted for mail fraud, and the government alleged that the relevant mailings were the invoices sent from the defrauded suppliers to the defendant's employer. The conviction was reversed; as in *Parr* and *Maze*, the fraud was completed prior to and independent of the mailing which was alleged to have been in furtherance of the scheme. *See Vontsteen*, 872 F.2d at 628-29.

We find that the relationship of the mailings to the scheme to defraud in this case is conceptually indistinguishable from those ruled to be outside the scope of the mail fraud statute in *Kann*, *Parr*, *Maze*, and *Vontsteen*. Here, the government presented very limited evidence pertaining to the relevant mailings. In this regard, the first relevant witness presented by the prosecution was Delia Bustillo, the custodian of records for the Financial Travel Records division of the Texas Department of Criminal Justice in Austin. Bustillo testified merely for the purpose of entering into evidence Evans's falsified travel vouchers; she offered no testimony that would link the mailing of the vouchers to Evans's scheme to defraud. The next witness, Christy Dolive, Clay's new parole officer and the custodian of his record at the Fort Worth office where Evans worked, was used to introduce Clay's parole

record into evidence. On cross-examination, she testified that all of the parole officers in the office submit travel vouchers for all of their state-related trips in the field. Finally, the last witness on this point was Andrew Presswood, a supervisor of parole officers at the Fort Worth office. He testified about various procedures in the parole office pertaining to supervising parolees, record-keeping, and reimbursement for travel expenses. With respect to the travel vouchers, Presswood testified that "[t]he officer completes their [*sic*] own travel vouchers. . . . [i]t goes to their [*sic*] respective supervisor for review and signature by the supervisor. . . . [t]hen it goes into an area of the clerk, and the staff mails it."[6] Presswood also noted that it "would be a problem" if a parolee's chronological record noted visits that did not correspond to travel vouchers requesting reimbursement for those visits. On cross-examination, Presswood confirmed that once the travel vouchers are sent to Austin, they are simply processed

---

[6] Though irrelevant to our determination that the mailings alleged in this case were not proved to have been made "for the purpose of executing" Evans's fraudulent scheme, we note that this evidence -- the only evidence in the record regarding the procedure by which the travel vouchers would be mailed to Austin -- does not seem sufficient to prove that Evans knowingly caused the vouchers to be mailed, as the statute requires. *See* 18 U.S.C. § 1341. Other than the mere circumstance that Evans worked in the office where all of this took place, there is no evidence in the record that Evans knew or should have known that the travel vouchers were mailed to Austin after she turned them in to her supervisor. In the absence of such evidence, it seems doubtful that the government could have satisfied its burden to prove that Evans knowingly caused the mailing of the travel vouchers.

for reimbursement. The vouchers are not scrutinized for irregularities regarding individual parolees.

The object of the alleged scheme to defraud was the circumvention of Clay's parole restrictions. Toward this end, Evans submitted false urine samples, made false and incomplete entries in Clay's chronological record, falsely reported visits to Clay in the field, provided Clay with information, and helped Clay to maintain the appearance of gainful employment. She accepted bribes of cash, personal property, drugs, and other benefits. But the aim of the scheme constituted defrauding the state of its right to Evans's honest and faithful services for the purpose of assisting Clay in violating conditions of parole. The mailing of the travel vouchers did not serve that goal because Evans had cleared the final hurdle when her supervisor approved her submitted travel vouchers.

The government contends that the mailings were for the purpose of executing the scheme because the scheme could not succeed if Evans had not submitted the travel vouchers. Put another way, Evans's supervisor would have discovered the scheme if she did not submit the travel vouchers. While that much is true, the submission of the vouchers to the supervisor and the supervisor's approval of those vouchers constituted the completion of the fraud. When the supervisor completed his review of the travel records and no suspicion had been raised, "the scheme had reached fruition." The mailings took place afterwards; the scheme in no way depended

-14-

upon the mailings or anything that happened after that point. As counsel noted at oral argument, if Evans's travel vouchers had been thrown away by her supervisor, the scheme would have continued just the same.[7] The mailing was entirely incidental to the scheme; there was nobody in Austin who might have uncovered the scheme because Evans did or did not submit travel vouchers.

The required nexus between the defendant's fraudulent scheme and her use of the mails in furtherance of that scheme -- a nexus which must be established in order to prove a crime under 18 U.S.C. § 1341 -- is the element that provides a basis for exerting federal jurisdiction over the crime of mail fraud. *See Vontsteen*, 872 F.2d at 628 & n.2. The problem with this mail fraud prosecution is not that Evans did not commit criminal acts, but that her criminal acts of fraud should have been prosecuted under the applicable state law, *see, e.g.*, TEX. PENAL CODE ANN. §§ 36.02, 36.08 (Vernon 1997), not a federal statute which cannot be stretched beyond its plain language. In reversing Evans's mail fraud convictions, we reject the prosecution's invitation to endorse a novel spin on clear statutory language in order to save a conviction.[8] Instead, we

---

[7] This argument also demonstrates why *United States v. Schmuck*, 489 U.S. 705, 109 S. Ct. 1443 (1989), is distinguishable from this case. Unlike the *Schmuck* case, there was no "relationship of trust and goodwill" between Evans and employees in Austin that had to be maintained in order for the scheme to continue undetected. *See Schmuck*, 489 U.S. 714, 109 S. Ct. at 1450.

[8] *See* Antonin Scalia, *Common-Law Courts in a Civil-Law System: The Role of United States Federal Courts in Interpreting the*

simply adhere to and enforce the plain text of the statute. Congress has limited the scope of federal jurisdiction over mail fraud, *cf.* **Maze**, 414 U.S. at 405, 94 S. Ct. at 651, and the prosecution in this case, in seeking to exploit a truly marginal relation to the mails, strayed beyond the boundary established by Congress.

Because the alleged mailings of travel vouchers were not "for the purpose of executing" Evans's scheme to defraud the State of Texas of her honest and faithful services as 18 U.S.C. § 1341 requires, we reverse her convictions on those five counts.


**III**.

Evans contends that the district court erred in departing upward from the Sentencing Guidelines in imposing the sentence on her extortion convictions. Although we have reversed the mail fraud convictions, Evans was sentenced to shorter, concurrent sentences on those counts. Thus, we must proceed to consider the propriety of the court's upward departure.

Using the November 1995 Sentencing Guidelines manual, the district court grouped Evans's five counts of extortion and five

---

*Constitution and Laws*, *in* ANTONIN SCALIA, A MATTER OF INTERPRETATION: FEDERAL COURTS AND THE LAW 3, 22 (1997) ("The text is the law, and it is the text that must be observed."); *cf.* Dennis W. Arrow, *Pomobabble: Postmodern Newspeak*[] *and Constitutional "Meaning" for the Uninitiated*, 96 MICH. L. REV. 461 (1997) (demonstrating sarcastically the capacity of text to be manipulated).

counts of mail fraud pursuant to U.S.S.G. § 3D1.2(d).  In such a case, the guideline which would result in the greatest sentence is used.  *See* U.S.S.G. § 3D1.3(b).  The court determined that the extortion counts resulted in a greater sentence under § 2C1.1 than would the mail fraud counts under § 2C1.7.  A base offense level of 10 was prescribed by § 2C1.1(a), and the court applied a two-level increase for repeated incidents of extortion (§ 2C1.1(b)(1)) and an eight-level increase because Evans was an official holding a sensitive position (§ 2C1.1(b)(2)(B) & cmt. 1).  This resulted in a total offense level of 20.  Evans had no criminal history, so she fell into category I, for which the guidelines provide a sentencing range of 33-41 months.

The district court determined that an upward departure from the guidelines was warranted because the case presented "an aggravating . . . circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described."  18 U.S.C. § 3553(b); U.S.S.G. § 5K2.0.  Adopting by reference the findings of the presentence report, the court listed a number of factors which informed its decision to depart upward.  These factors included: the risk posed to the community inherent in a massive drug-dealing operation to distribute over 1.5 kilograms of crack cocaine and 150 kilograms of powder cocaine; the use of illegal drugs; and obstruction of

justice by falsifying various parole records. The court concluded that these were unique factors which took Evans's offense outside the heartland of cases taken into consideration by the Sentencing Commission, and upward departure was therefore warranted. *See **Koon v. United States***, 518 U.S. 81, 95, 116 S. Ct. 2035, 2045 (1996). An additional six-level upward departure to an offense level of 26 was therefore imposed. Evans was sentenced to a 72-month prison term.

Evans asserts that, with one exception, all of the above factors are inherent results of extortion. She argues that upward departure was prohibited because the Sentencing Commission must have taken those factors into account in setting the guidelines. Evans concedes that her use of drugs is exceptional, and would support an upward departure, but not one as severe as that applied in her case. With respect to the danger presented to the public and the obstruction of justice incident to permitting the operation of a large drug-dealing operation, Evans contends that these possibilities were anticipated by the base offense level set for extortion and the eight-level increase applied when an official in a sensitive position is involved.

We review the district court's application of the Sentencing Guidelines for abuse of discretion. *See **Koon***, 518 U.S. at 98-100, 116 S. Ct. at 2046-48. The procedure for considering upward departure is now well-settled.

[A] sentencing court considering a departure should ask the following questions:

> "1) What features of this case, potentially, take it outside the Guidelines' 'heartland' and make of it a special, or unusual, case?

> "2) Has the Commission forbidden departures based on those features?

> "3) If not, has the Commission encouraged departures based on those features?

> "4) If not, has the Commission discouraged departures based on those features?"

*Koon*, 518 U.S. at 95, 116 S. Ct. at 2045 (quoting *United States v. Rivera*, 994 F.2d 942, 949 (1st Cir. 1993)).  The district court followed this procedure, setting out its reasons for departure, as described above.  The factors considered by the district court have not been forbidden, and, in fact, are encouraged.  The Sentencing Commission's policy statement on criminal purpose states that "[i]f the defendant committed the offense in order to facilitate or conceal the commission of another offense, the court may increase the sentence above the guideline range to reflect the actual seriousness of the defendant's conduct."  U.S.S.G. § 5K2.9.  This is, indeed, exactly what the district court did.  In moving Evans's criminal offense level to 26, the court compared her to another member of Clay's organization who had a similar level of culpability.  Her sentence was designed to reflect the "actual seriousness" of her serious abuse of office.

-19-

There is some truth to Evans's protest that in the case of any extortion involving a government official, violations of the law and a public hazard are foreseeable results. Evans's case is, however, truly extraordinary. Even if incidental violations of law and dangers to the public were taken into account by the Sentencing Commission, the sheer scale of the violations and the extremely serious threat posed to public safety remove Evans's case from the heartland of cases envisioned. The district court did not abuse its discretion in so holding, and we affirm the sentence imposed.

**IV**

For the foregoing reasons, we REVERSE Cynthia Bennett Evans's mail fraud convictions, and her sentence on those counts is VACATED. The district court's disposition in all other respects is AFFIRMED.

REAVLEY, Circuit Judge, dissenting in part:

I would affirm the mail fraud convictions because the indictment charged and the evidence proved an ongoing scheme that included the use of the mail to collect the travel vouchers. The indictment cannot be read to allege that Evans acted gratuitously in assisting Clay; it alleges that she acted for personal financial gain. Counts 1 through 5 allege that she accepted bribes from Clay in violation of the Hobbs Act, 18 U.S.C. § 1951(a). Counts 6

-20-

through 11 allege the commission of mail fraud involving the use of travel vouchers. Count 6, which details the overall mail fraud scheme, alleges that Evans devised a scheme "to defraud [her employer] of her honest and faithful services," and that the acts in furtherance of the scheme included the receipt of cash payments from Clay, as well as the making of "false and incomplete entries into the business records" of her employer, including travel vouchers indicating "periodic visits to John Clay's place of employment and place of residence." The indictment can fairly be read to allege that the scheme's financial rewards to Evans included not only the payments from Clay, but the payment of false travel vouchers by her employer.

Evans falsely recorded required visits in Clay's record which were never made, and submitted corresponding travel vouchers, and the evidence was sufficient to prove that Evans knowingly caused the vouchers to be mailed. On the appropriate box on the vouchers, Evans requested that the reimbursements be paid directly to her. Supervisor Presswood testified that the vouchers are mailed to an office in Austin, and paid from that office. A rational jury could conclude that Evans must have realized that the vouchers, which are handwritten on printed forms, were mailed to Austin when she received her payment from the Austin office.

As to the Supreme Court authority discussed by the majority, I would distinguish those decisions the majority finds indistinguishable, and find indistinguishable the one case the

-21-

majority distinguishes. *Kann v. United States*, 323 U.S. 88, 65 S. Ct. 148 (1944), involved the cashing of fraudulent checks by the defendants. The Supreme Court ruled that the scheme had "reached fruition" before the checks were mailed. "The persons intended to receive the money had received it irrevocably. It was immaterial to them, or to any consummation of the scheme, how the bank which paid or credited the check would collect from the drawee bank." 323 U.S. at 94; 65 S. Ct. at 151. In the pending case, Evans did not receive all the fruits of her fraud, and did not complete the fraud on her employer, until the vouchers were mailed, and payments from Austin were received by her.

*United States v. Maze*, 414 U.S. 395, 94 S. Ct. 645 (1974), held that a defendant who made fraudulent use of a credit card to obtain goods and services at motels was not liable under the mail fraud statute, where the alleged mailings were the invoices sent from the motels to the bank that issued the card. The Court again held that the fraud reached fruition before the invoices were mailed. "Indeed, from [defendant's] point of view, he probably would have preferred to have the invoices misplaced by the various motel personnel and never mailed at all." 414 U.S. at 402, 94 S. Ct. at 649.

The defendants in *Parr v. United States*, 363 U.S. 370, 80 S. Ct. 1171 (1960), were accused of misappropriating funds from a school district. Most of the mail fraud counts were premised on

-22-

mailings related to the collection of school taxes, rather than the misappropriation of school funds resulting from the taxes. The Court reversed the convictions under these counts because "the indictment did not allege, and there was no evidence tending to show, that the taxes assessed and collected were excessive, 'padded' or in any way illegal . . . ." 363 U.S. at 387, 80 S. Ct. at 1181. Even counsel for defendants conceded that if an employee "improperly 'pads' or increases the amounts of the statements and causes them to be mailed to bring in a fund to be looted, such mailings, not being those of the employer . . . would constitute an essential step 'for the purpose of executing [a] scheme' to defraud, in violation of § 1341." 363 U.S. at 386, 80 S. Ct. at 1181. In the pending case, the documents mailed -- the travel vouchers -- were themselves fraudulent because Evans "padded" the claims for reimbursement with travel that never occurred.

I would affirm under *Schmuck v. United States*, 489 U.S. 705, 109 S. Ct. 1443 (1989). In *Schmuck*, the defendant rolled back the odometers of automobiles and sold them to car dealers, who then resold them to retail customers. The alleged mailings associated with the fraud were the mailing of title application forms from the dealers to the state department of transportation, a necessary step in transferring title to the retail customer. The Court noted that defendant Schmuck had longstanding relations with some of the dealers, and that "[h]is was an ongoing fraudulent venture. A

rational jury could have concluded that the success of Schmuck's venture depended upon his continued harmonious relations with, and good reputation among, retail dealers, which in turn required the smooth flow of cars from dealers to their Wisconsin customers." 489 U.S. at 711-12, 109 S. Ct. at 1448. The Court distinguished *Kann*, *Parr*, and *Maze*, and affirmed the convictions, reasoning that "a failure of this passage of title would have jeopardized Schmuck's relationship of trust and goodwill with the retail dealers upon whose unwitting cooperation his scheme depended." 489 U.S. at 714, 109 S. Ct. at 1450.

As in *Schmuck*, Evans' ongoing fraudulent scheme depended on continued harmonious relations with her employer. Failure to submit routine travel vouchers consistent with Clay's parole file put at risk her relationship of trust and goodwill with her employer, since Presswood testified that an inconsistency between the travel vouchers and the parole file would have raised a red flag.

The facts of the pending case present a more compelling case of mail fraud than the facts of *Schmuck*. First, the documents mailed in *Schmuck* were themselves totally innocent, while in the pending case the mailed travel vouchers were fraudulent. Second, to the extent that *Schmuck* turned on a relationship of trust and goodwill, such a relationship was even more important to Evans than to Schmuck. The defendant and the dealers in *Schmuck* had ongoing

business relations, to be sure, but in the pending case Evans was an employee who occupied a sensitive post.