United States Court of Appeals
Fifth Circuit

**F I L E D**

**May 18, 2004**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT
_____

No. 03-10559
_____

UNITED STATES OF AMERICA,

                                        Plaintiff - Appellant,

                    versus

FREDRIC WAYNE STRONG,

                                        Defendant - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Texas

_____

Before JOLLY, JONES and BARKSDALE, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Fredric Wayne Strong was convicted by a jury of mail fraud in connection with his fraudulent acquisition and sale of automobiles, but the district court entered a judgment of acquittal. The government appeals, seeking to reinstate the conviction. There is no question but that the government established both a fraudulent scheme, and the use of the mails. The question in this appeal, however, is whether the mailings -- fraudulent applications for certified copies of original titles, "CCOs," mailed by the local Texas Department of Transportation, "TDOT," to the TDOT headquarters in Austin -- are sufficiently related to the

fraudulent scheme itself to prove a violation of the mail fraud statute, 18 U.S.C. § 1341. We find the evidence insufficient to establish that the mailings were sufficiently related to the success of the scheme, and thus affirm the district court's judgment of acquittal.

I

Strong, a former Dallas police officer, and his brother, a former used car dealer, were involved in a fraudulent scheme known as "punching titles." The brothers "purchased" cars at automobile auctions using buyers' drafts that they never intended to honor. This ploy allowed them to take immediate physical possession of the cars while the original titles remained with the auctioneers while the drafts cleared.

After obtaining the cars, Strong would travel to the Carrollton branch of the TDOT and, in full police uniform, apply for CCOs using forged lienholder and/or automobile owner signatures. After obtaining the CCOs, the Strongs would use them in selling the cars to innocent purchasers.

Ten days after the Strongs took possession of a car, the unpaid draft would return to the auction houses. The auction houses then would futilely attempt to reclaim the cars. The Strongs' scheme thus resulted in substantial losses to the auction houses, as well as clouding the titles of the bona fide purchasers.

TDOT policies provide that upon request of a patron, local TDOT branches may issue CCOs on the spot. (Each time Strong

2

applied for a CCO, the Carrollton branch office issued it immediately.) In the course of processing CCO requests, local TDOT branch offices routinely mail CCO applications to the TDOT headquarters in Austin where the documents are microfilmed for record-keeping purposes. After being microfilmed, the original applications are destroyed.

On September 25, 2002, the Strongs were indicted on eight counts of mail fraud. Although his brother pled guilty, Fredric Strong opted to go to trial. The jury found Strong guilty of three counts of mail fraud under 18 U.S.C. § 1341. Consistent with his motions for judgment of acquittal during trial, Strong then moved for a judgment of acquittal under FED. R. CRIM. P. 29, which the district court granted on May 1, 2003.

In entering the judgment of acquittal, the district court held that the use of the mails (namely the mailing of the CCO applications from Carrollton to Austin) was not sufficiently related to the fraud scheme because each fraudulent act was complete when Strong obtained the CCOs from the local TDOT office, the mailings did not assist Strong in covering up the fraud, and the evidence did not establish that Strong could have reasonably foreseen the mailings. The government contends, however, that the evidence is sufficient to uphold the convictions and that the jury verdict should be reinstated.

We review a district court's grant of a motion for judgment of acquittal *de novo*. United States v. Deville, 278 F.3d 500, 505 (5th Cir. 2002). In reviewing such a determination, we apply the same standard as the district court. Id. Here, we must determine whether, viewing the evidence in the light most favorable to the government, "a reasonable-minded jury could find the admissible evidence sufficient to support the jury's verdict of guilty." U.S. v. Maner, 611 F.2d 107, 108 (5th Cir. 1980). This Court has repeatedly emphasized that "all reasonable inferences and credibility choices must be made in favor of the jury verdict." Deville, 278 F.3d at 505 (internal quotation marks and citations omitted).

To prove that a defendant engaged in mail fraud under 18 U.S.C. § 1341, the government must show: "(1) a scheme to defraud; (2) use of the mails to execute that scheme; and (3) the specific intent to defraud." United States v. Bieganowski, 313 F.3d 264, 275 (5th Cir. 2002).[1] The parties do not dispute the existence of

---

[1]Section 1341 provides, in relevant part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice or attempting to do so . . . knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any

a scheme to defraud, nor do they dispute Strong's specific intent to defraud.  The only question before this Court, then, is whether the evidence presented at trial, viewed in the light most favorable to the jury verdict, was sufficient for a reasonable jury to find that the second requirement of the mail fraud statute -- that the mailings were used to execute the fraudulent scheme -- was satisfied.

A

The Supreme Court has held that for a mailing to be part of the execution of a fraudulent scheme, "the use of the mails need not be an essential element of the scheme."  Schmuck v. United States, 489 U.S. 705, 710 (1989) (quoting Pereira v. United States, 347 U.S. 1, 8 (1954)).  "It is sufficient for the mailing to be 'incident to an essential part of the scheme' or 'a step in [the] plot.'"  Id. at 710-11 (citations omitted).  In order to discern the precise meaning and appropriate application of these words to our case, we must study the Supreme Court's seminal mail fraud opinion further.

In Schmuck, the defendant was a used car dealer who bought cars, rolled back their odometers, and then resold them to other dealers at a higher price.  Id. at 711.  After Schmuck had thus

_____

> such matter or thing, shall be fined not more
> than $1,000 or imprisoned not more than five
> years, or both.

18 U.S.C. § 1341.

5

sold the cars and had fraudulently obtained his money, the dealers who had bought the cars then resold them to innocent purchasers and mailed the title applications to the state motor vehicles agency on behalf of the new owners.  This exercise transferred title from the dealer to the owner, who then used the title to acquire a tag.  Id. The Court held that a rational jury could have found that the success of Schmuck's scheme turned on his continued good relations with the local dealers, who were his regular customers, and those good relations depended in part on the successful passage of title from those dealers to their customers.  Id. at 711-12.  As a result, the mailing of the title applications was an incident of a "scheme which did not reach fruition until the retail dealers resold the cars and effected the transfer of title," id. at 712, because only then did Schmuck's customers, the car dealers, have customers satisfied with Schmuck's cars.  That is to say, the Schmuck mailings, while not directly contributing to the "duping of either the retail dealers or the customers," were nonetheless "incidental to an essential part of the scheme."  Id. (citing United States v. Shyrock, 537 F.3d 207, 208-09 (5th Cir. 1979) (holding that a local motor vehicle department's mailing of title applications to state headquarters furthered a dealer's odometer-tampering scheme)).

In upholding the convictions, the Schmuck Court was faced with the formidable task of distinguishing three earlier cases in which the Court found that the mailing element of the mail fraud statute

6

could not be satisfied once the actual scheme was completed.  In Kann, the Supreme Court held that the mailing of fraudulently cashed checks between two banks did not meet the "incident to an essential part of the scheme" test because the fraud was complete when the defendants obtained the cash from the first bank.  Kann v. United States, 323 U.S. 88, 94-95 (1944).  The Court noted that because the defendants had already fraudulently obtained the money, "[i]t was immaterial to them, or to any consummation of the scheme, how the bank which paid or credited the check would collect from the drawee bank."  Id. at 94.  In Maze and Parr, the defendants engaged in unauthorized use of a government credit card and were charged with mail fraud based on the subsequent mailing of the invoices to the credit card holder by the credit card company. United States v. Maze, 414 U.S. 395 (1974); Parr v. United States,

363 U.S. 370 (1960).[2]  In both of these cases, the Supreme Court held that the mailing element could not be met because the scheme was complete when the defendants received the goods and services they obtained at the time they used the fraudulent credit cards. Thus, the subsequent mailings were immaterial to the success of the fraudulent scheme.  Parr, 363 U.S. at 393; Maze, 414 U.S. at 402.

The Schmuck Court did not overrule these cases.  It distinguished Kann, Parr, and Maze by noting that the mailings in these three earlier cases "involved little more than post-fraud accounting among the potential victims of the various schemes," and that "the long-term success of the fraud did not turn on which of the potential victims bore the ultimate loss."  Schmuck, 489 U.S. at 714.  By contrast, Schmuck's ensuring that title was properly transferred was important to the ongoing success of his fraudulent odometer-tampering scheme and thus the mailing of the title applications satisfied the statutory requirement.  Id.

_____

[2]In Parr, the Court also dealt with a second fraudulent scheme relating to the misappropriation of tax revenue, where the government brought mail fraud charges based on the mailing of tax statements, checks, and receipts.  363 U.S. at 390.  The Court held that the mailing element could not be met because the mailings were "made under the imperative command of duty imposed by state law." Id. at 391.  In Schmuck, it further clarified its Parr holding by noting that although the mailings in both cases were compelled by law -- tax laws in Parr and car registration procedure in Schmuck -- the Parr mailings would have taken place "regardless of the defendant's fraudulent scheme," as contrasted with Schmuck, where the mailings were "derivative of Schmuck's scheme to sell 'doctored' cars and would not have occurred but for that scheme." Schmuck, 489 U.S. at 713 n.7.

8

Synthesizing the Supreme Court's holding in Schmuck with these other precedents -- which the Court accepted -- and in breaking down Schmuck's rationale, it is clear that the Court's statement that a mailing need merely be "incident to an essential part of the scheme" to satisfy the mail fraud statute, id. at 711 (quoting Pereira, 347 U.S. at 8), is cabined by the materiality of the mailing, as well as its timing: A tangential mailing occurring after the success of a fraud scheme is complete would never qualify, even if the mailing is "incidental" to a part of the scheme.

In this appeal, the government argues that the Kann-Maze line of cases is distinguishable for reasons similar to those noted in Schmuck; namely, that the fraudulent scheme hatched by Strong had not come to fruition prior to the mailings. Strong responds that the mailings occurred after the fraud was complete; once the CCO was obtained, the subsequent mailing to Austin was a mere formality and totally immaterial to the success of Strong's fraudulent scheme. Resolving this dispute turns on an analysis of the fraud scheme in the light of the evidence presented: Was it an "ongoing fraudulent venture" that relied on third parties' continuing confidence and good will after each incident of fraud, or was it a series of one-shot operations in which the scheme was successfully complete with the receipt of a CCO and the sale of the car?

B

9

In Schmuck, the Court found an ongoing fraudulent scheme based on evidence that over 150 cars had been tampered with, the defendants' 12 separate jury convictions, and the defendants' 15-year relationship with the car dealers that were the unwitting participants in the scheme. Schmuck, 489 U.S. at 711-12. Here, the fraud was of a much smaller scale than in Schmuck -- the jury convicted Strong of three fraudulent transactions over the course of seven months -- although this fact alone does not conclusively demonstrate the absence of a broad scheme to defraud. See, e.g., United States v. Vontsteen, 872 F.2d 626, 627-29 (5th Cir. 1989) (finding a broad scheme to defraud where the conduct at issue took place over less than a year).

Importantly, and as noted by the district court, the mailings here are not directly related to the passage of title as they were in Schmuck; full unclouded title never passed, and Strong obtained CCOs and sold them to new owners irrespective of any internal TDOT procedures. Yet the mailings were not as unrelated to the fraudulent scheme as were the intra-bank mailings in Kann and the credit card invoices mailed after the fraudulent activity in Parr and Maze. See, e.g., Schmuck, 489 U.S. at 1450 (referring to the mailings in the Kann-Maze line of cases as "little more than post-fraud accounting"). As a result, this case falls in the interstices between Schmuck and the Kann-Maze line of cases: The scheme was ongoing, yet each act of fraud was discrete.

10

The question, then, is whether the mailings themselves somehow contributed to the successful continuation of the scheme -- and, if so, whether they were so intended by Strong. See Schmuck, 489 U.S. at 711-12 ("The relevant question at all times is whether the mailing is part of the execution of the scheme *as conceived by the perpetrator*.") (emphasis added); see also United States v. Shively, 927 F.2d 804, 814 (5th Cir. 1991) ("The relevant inquiry is whether the mailings were 'sufficiently closely related' to the fraudulent scheme to bring it within the scope of § 1341.") (quoting Maze, 414 U.S. at 399).

C

Thus, to sustain Strong's conviction, the government must present evidence that shows a link between the fraudulent activity and the mailings at issue which demonstrates that the mailings either "advanced or were integral to the fraud." Vontsteen, 872 F.2d at 629. In support of its position that the mailing of the CCO applications was integral to the continuation of the fraudulent activity, the government essentially argues that Strong applied for the CCOs for two reasons: to accomplish the fraud by selling a "titled" car, and to lend authenticity to the fraudulent title by having the CCO application appear in TDOT's microfilmed records.

According to the government, this latter motive makes the mailing of the CCO applications "incident to" an essential part of the fraud because the victims of the fraud (automobile purchasers)

11

would be "lulled" into a false sense of security by the "air of regularity" of the presence of a complete title record in Austin.[3] The mailing of the applications was thus incident to an official imprimatur of legitimacy to the CCO and delayed the discovery of the fraud by the innocent purchasers, thereby allowing the scheme to continue uninterrupted. The government argues that testimony regarding the storage of the title records in Austin could have led the jury to surmise that Strong wanted the title records in Austin to appear complete, such that a diligent bona fide purchaser investigating a car's title would not detect the scheme.

There is no question but that the evidence overwhelmingly establishes that Strong was engaged in a broad scheme to defraud, and that a number of mailings were made over at least a seven-month period. Yet the government has presented little evidence linking the mailings to Strong's fraudulent scheme such that the mailings

---

[3]The Supreme Court has held that certain mailings sent after the defendants have obtained the fraudulently sought funds or services may fall within the ambit of the mail fraud statute. See United States v. Sampson, 371 U.S. 75 (1962) (holding that mailing element was satisfied where the defendants sent letters to fraud victims in an attempt to convince them that the promised services would be performed even though mailings were sent after victims' money had been obtained). Subsequent mailings that are "designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely," fall within the ambit of the mail fraud statute. See United States v. Lane, 474 U.S. 438, 451-52 (1986); see also United States v. Helms, 897 F.2d 1293, 1297 (5th Cir. 1990) (holding that subsequent mailings "which are designed to lull the victim into a false sense of security, postpone inquiries or complaints, or make the transaction less suspect are mailings in furtherance of the scheme").

12

can be said to have a "lulling" effect or that Strong intended this mailing as part of his scheme. The cases considering "lulling" generally evaluate the lulling effect of the mailings on the victims of the fraud. Sampson, 371 U.S. at 80-81 (letters from defendants to victim investors suggesting promised services would be rendered); Lane, 474 U.S. at 452-53 (false proof of loss forms mailed by defendants to victim insurance company); Helms, 879 F.2d at 1296-97 (letter from defendants to victim investors regarding potential of investment to fulfill false promises); Shively, 927 F.2d at 814-15 (letter from defendants to victim financing company attempting to delay detection of fraudulent scheme).

Of all this Court's precedent, the most apt is the case on which the district court relied, United States v. Evans, 148 F.3d 477 (5th Cir. 1998). In Evans, a parole officer was charged with mail fraud in submitting false travel vouchers that, after being processed by her supervisor, were mailed to Austin for record-keeping. Evans, 148 F.3d at 483. This Court found the mailing requirement was not satisfied because the fraud was complete each time the supervisor approved the vouchers. Id. The regularity of the mailings, viewed in one light, could have been seen as intending to ratify the voucher reimbursement so as to allow the broader fraud to continue unabated, but that inference *alone* does not implicate § 1341.

13

The mailings at issue here, as in <u>Evans</u>, do not qualify as "lulling" letters because the record contains no evidence that they do lull the victims of the fraud, the auction dealers and innocent purchasers.[4]  Indeed, the mailings, by introducing a secondary chain of title into state records, are more likely to alert an investigator to the fraud than to somehow delay its detection. Though the relevant question "is whether the mailing is part of the [fraud scheme] as conceived by the perpetrator . . . regardless of whether the mailing later may prove to be counterproductive," <u>Schmuck</u>, 489 U.S. at 715, it is counterintuitive to conclude that a defendant who knew enough about TDOT procedures to envision an inter-office mailing as part of his fraud would not realize the fraud-revealing implication of such a mailing on title records.

In sum, drawing all inferences from the facts in the record in favor of the verdict, the government has presented insufficient evidence such that a jury could reasonably link the mailing of CCO applications to the success of Strong's "title punching" fraud

---

[4]The TDOT, whom the government contends is also a victim, is simply too far removed to be considered as a target of the Strongs' scheme.

14

scheme.[5]  Accordingly, the district court did not err in setting aside the jury verdict of conviction.

### III

For the foregoing reasons, which are essentially an elaboration of the district court's rationale, the judgment of the district court is

AFFIRMED.

---

[5]In addition to establishing a connection between the mailings and the fraud, the government must show that Strong committed "an act with knowledge that the use of the mails will follow in the course of business, or where such use can reasonably be foreseen." United States v. Reyes, 239 F.3d 732, 736 (5th Cir. 2001) (quoting Pereira v. United States, 347 U.S. 1, 8-9 (1954)).  That is, as Strong did not himself do the mailing, a lawful conviction requires evidence that he at least foresaw it.  While we are doubtful that the government provided sufficient evidence of foreseeability, we need not reach this issue because of the insufficiency of the evidence linking the mailings to the fraud.

15