*534 DeMOSS, Circuit Judge,
concurring in part and dissenting in part:
I join without reservation Judge Jolly’s opinion with respect to the honest services theory of the Indictment and the issue of insufficiency of the evidence as to Fuhs. However, I write separately to explain two additional points with respect to the honest services charge and to dissent with respect to Brown’s convictions for perjury and obstruction of justice.
I.
With respect to § 1346 and the honest services theory, I would reach the Defendants’ constitutional challenge and also point out the multiple and troubling problems with the Government’s theory of applying § 1346 to these facts, even though the majority opinion disposes of the Defendants’ appeal.
In our Brumley dissent, Judge Jolly and I did our best to point out the ambiguities in the text of § 1346 that gave us grave reservations about the statute’s application. While we did not there call into question the statute’s constitutionality as applied, 116 F.3d at 736 (Jolly and DeMoss, JJ., dissenting), I have since then twice had occasion to address § 1346. See United States v. Griffin, 324 F.3d 330, 356 (5th Cir.2003); United States v. Evans, 148 F.3d 477 (5th Cir.1998). The Defendants have raised here a constitutional challenge to § 1346, and in my view the panel should now address that issue. Years of review of the application of § 1346 to varied facts persuade me that the constitutionality of § 1346 may well be in serious doubt. A federal criminal statute must define the crime “with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.” Kolender v. Lawson, 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). Section 1346’s text is undeniably vague and ambiguous and is subject to wide variation in application by the lower courts. Rather than address the larger constitutional problem with this statute, which would provide clarity to Congress, prosecutors, and the lower courts, the circuit courts have instead only clouded the meaning of § 1346 by repeatedly resolving the ambiguities of the statute’s text via judicially created definitions and limitations. Our Court and our sister circuits end up doing precisely what most would say we lack the constitutional power to do, that is, define what constitutes criminal conduct on an ex post facto and ad hoc basis. In this regard, I add my voice to the dissenters in Rybicki 354 F.3d at 163-65 (Jacobs, J., dissenting). Congress should repair this statute that, in my opinion, fails to provide the requisite “minimal guidelines to govern law enforcement.” Id. at 358, 103 S.Ct. 1855.
Additionally, the application of § 1346 to the facts presented in this case is particularly problematic for several reasons, the combination of which poses an even greater harm to future business relationships and transactions than would any one of the problems alone. The Government’s extension of the already ambiguous reach of § 1346 by way of an indictment for conspiracy to commit honest services fraud is especially troublesome. While § 1346’s text offers little guidance on the scope of the crime’s application, see Brumley, 116 F.3d at 741-42, 746 (Jolly and DeMoss, JJ., dissenting), at a minimum the word “services” has been in the past the basis for the statute’s pr e-McNally application to the employer/employee relationship. See id. at 734 (Higginbotham, J., majority opinion). To the extent that pr e-McNally case law required a relationship that generated a duty of honest services, such a *535 relationship does not exist in this ease between the Defendants, who are employees of Merrill, and Enron or its shareholders, who are the purported victims of the alleged fraud. The limitation of criminal activity to relationships giving rise to a duty of honest services is ignored when any person who negotiates with an employee of another corporation is potentially entangled by the combination of § 1346 with our very broad understanding of conspiracy.
I also believe that a serious problem arises with respect to the Government’s theory of harm in this case. It is absolutely undisputed that Merrill paid $7 million to Enron as a result of the closing of the transaction contemplated by the Engagement Letter of December 29, 1999 that was the final written agreement of the two parties (“the Engagement Letter”). Even granting the Government that Enron paid back $250,000 as the advisory fee to Merrill, Enron still had $6,750,000 more in its bank account as a result of the Engagement Letter than it had before. The Government’s theory of harm would have us ignore the initial gains to Enron and focus solely upon some later loss only tangentially connected to the particular investment transaction that forms the basis of the Indictment.
The cumulative effect of a vague criminal statute, a broad conception of conspiracy, and an unprincipled theory of harm that connects the ultimate demise of Enron to a single transaction is a very real threat, of potentially dramatic proportion, to legitimate and lawful business relationships and the negotiations necessary to the creation of such relationships.
II.
I dissent from the portion of the majority opinion that affirms the convictions of Brown for perjury and obstruction of justice. I cannot agree with the majority that on this record, particularly the portions quoted in the majority opinion, a reasonable jury could conclude that Brown’s allegedly perjurious statements were in fact false. Brown argues that his testimony was true because it represented his subjective understanding of the transaction contemplated by the Engagement Letter. I agree. The majority relies primarily upon four points of evidence to support its assertion of falsity: Furst’s explanations to Brown that Enron viewed the deal as a “bridge to permanent equity”; the discussions of the December 22 conference call; working drafts of the Engagement Letter transmitted between Merrill and Enron that were never signed; and Brown’s own e-mail of March 2001. These four points, along with other circumstantial evidence, comprise two types of evidence: (1) business negotiations preceding a deal ultimately reduced to a written agreement and (2) an after-the-fact oversimplification and shorthand description of the barge partnership investment by Merrill employees during the discussion and evaluation of a subsequent and entirely unrelated deal. Neither of these types of evidence should be used to support an inference of the falsity of Brown’s testimony.
The evidence regarding both working drafts of the Engagement Letter and discussions between employees of Enron and employees of Merrill leading up to the final written agreement are simply the heart and soul of business negotiations and should not indicate the character of the ultimate business transaction. Some negotiations may ultimately be reflected in the final written agreement, but some may not. Here, negotiations are no evidence of the actual nature of the deal because there was no legally enforceable take-out promise in the final written agreement; instead, the parties merely bargained for Enron’s *536 best efforts to continue to market Merrill’s investment interest in the barge partnership to the mutual benefit of both companies.
Such an agreement does not undermine the nature of the transaction as set forth in the Engagement Letter that was ultimately agreed to and signed by both parties. Employees of Enron and Merrill may well have considered a buy-back agreement, promise, or guarantee during the negotiations leading up to the barge deal; the evidence would certainly permit a reasonable jury to so conclude. But the final written agreement excludes this term. Instead, the parties relied upon their established business relationship and discussions of best efforts and strong comfort that Enron would continue its efforts to find a third-party buyer for Merrill’s interest in the barge partnership. The conversations preceding the deal are only negotiations, and the ultimate written agreement speaks for itself. Two material facts corroborate this reading: (1) Fastow himself averred to the Government that he, in fact, made only assurances of best efforts to Merrill, not promises or guarantees to take Merrill out of the deal; and (2) in conformance with the written agreement, Merrill actually paid $7 million to Enron, consistent with its purchase of an interest in the barge partnership investment, and therefore had absolutely no legally enforceable claim to be taken out of the deal. The Government mischaracterizes the transaction evidenced by the Engagement Letter when it labels the agreement a “sham” and asserts that Merrill was never “at risk” during the transaction. The Engagement Letter expressly states, “No waiver, amendment, or other modification of this Agreement shall be effective unless in writing and signed by the parties to be bound.” Likewise, the Engagement Letter also includes the following provision: “This Agreement incorporates the entire understanding of the parties with respect to this engagement of Merrill Lynch by Enron, and supercedes all previous agreements regarding such engagement, should they exist.” In light of these provisions, Merrill’s $7 million was absolutely at risk. Any oral assurances of a take-out offered to Merrill by any Enron employee would not have been legally binding on Enron.
In my view, both parties acted to maximize mutual benefits in a clear effort to solidify a business relationship. Both parties relied on the good faith of each other in laying a foundation for continued business relationships. Merrill could not have enforced Enron’s assurance of its best efforts commitment to remarket the investment interest that Merrill had agreed to purchase; Merrill could only have refused to deal with Enron in the future if the Engagement Letter had resulted in an unsatisfactory business investment. Such negotiations should not be the fodder for criminal indictments. If there is any criminal wrong arising from the facts in this record, and I have serious doubts on that score, it would be in Enron’s employees’ reporting of the transaction described in the Engagement Letter, not in the manner in which Merrill’s employees negotiated the deal.
Brown’s March 2001 e-mail was not a statement under oath; rather, it was a statement made to another Merrill colleague fifteen months after the Engagement Letter transactions that discussed a proposed loan transaction with a potential borrower, a large corporate entity entirely unrelated to Enron (referred to in the email as “CAL”). The talking point in the e-mail was whether Merrill would be a secured or an unsecured lender in the proposed deal. The pertinent part of the e-mail reads,
*537 If it[’]s as grim as It sounds, I would support an unsecured deal provided we had total verbal [ajssurance from CAL ceo or Cfo, and [SJhuite was strongly vouching for it. We had a similar precedent with Enron last year, and we had Fastow get on the phone with Bayly and lawyers and promise to pay us back no matter what. Deal was approved and all went well. What do you think?
The text of the e-mail reveals that Brown was attempting to use the success of the earlier deal with Enron to persuade a colleague that the deal with CAL would likewise be successful. In the email, Brown did not distinguish the two deals. But the Enron deal and the CAL deal discussed in the e-mail differ in at least one important respect: the Enron deal involved the sale of an equity interest in an Enron partnership to Merrill and the CAL deal involved a loan by Merrill to CAL for funds to be used in building an extension to CAL’s facilities. At the time the e-mail was written, Brown may have remembered the Enron deal as some sort of loan by Merrill to Enron; however, the Engagement Letter and the evidence before the jury reveal no such transaction. No legally enforceable promise was ever made to take Merrill out of the Enron deal. Accordingly, no reasonable jury could construe the e-mail as anything but an overly simplified, shorthand description of the barge investment made after the fact in an effort to secure a subsequent, entirely unrelated deal. Under this reading of the email, Brown’s testimony before the Grand Jury was not inconsistent with the text of the email because there simply was no promise or guarantee regarding a take-out in the Enron deal. The questions posed by the Grand Jury related only to an enforceable take-out, not to an oral “promise to pay us back no matter what,” and Brown’s answers to those questions therefore do not conflict with his statements in the e-mail.
Finally, the Government’s own evidence supports a conclusion that the only comfort offered to Merrill was that Enron would use its best efforts to sell to a third party. A reasonable jury could not convict Brown of perjury where the Government speaks out of both sides of its mouth with respect to the allegedly perjurious testimony. The Government simultaneously proffers the identical words as both evidence of Brown’s guilt of perjury when the words are spoken by Brown and as evidence of the nature of the Enron transaction not being a sale when offered by the Government’s own witnesses.
I conclude, therefore, that no reasonable jury could conclude that Brown’s testimony before the Grand Jury was false. Accordingly, I must conclude that no reasonable jury could convict Brown of perjury. See 18 U.S.C. § 1623. Moreover, the sole basis in the Indictment for the charge against Brown of obstruction of justice, see 18 U.S.C. § 1503(a), was Brown’s allegedly false statements to the Grand Jury. Accordingly, I would also conclude that no reasonable jury could find Brown guilty of obstruction of justice on this record.
For the foregoing reasons, I would reverse the conviction of Brown on the perjury and obstruction of justice counts.