

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-20-2002

# USA v. Tiller

Precedential or Non-Precedential: Precedential

Docket No. 01-2791

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"USA v. Tiller" (2002). *2002 Decisions.* Paper 521.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/521

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

        Filed August 20, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-2791

UNITED STATES OF AMERICA

v.

FREDA TILLER
a/k/a
FREDA TOLLIVER,

        Appellant

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

District Court Judge: Honorable Anita B. Brody
(D.C. No. 99-cr-00485)

Argued: May 6, 2002

Before: NYGAARD, ALITO, and ROSENN, Circuit Ju dges

(Opinion Filed: August 20, 2002)

        ARTHUR THOMAS DONATO, JR.
        211-213 North Olive Street
        Media, Pennsylvania 19063

        MARY E. WELCH (Argued)
        117-119 North Olive Street
        Media, Pennsylvania 19063

        Co-Counsel for Appellants



        PATRICK L. MEEHAN
         United States Attorney
        LAURIE MAGID
         Deputy United States Attorney for
        Policy and Appeals
        ROBERT A. ZAUZMER
         Assistant United States Attorney
         Senior Appellate Counsel
        JOEL D. GOLDSTEIN (Argued)
         Assistant United States Attorney
        Room 1250
        615 Chestnut Street
        Philadelphia, Pennsylvania 19106

        Counsel for Appellee

OPINION OF THE COURT

ALITO, Circuit Judge:

In this appeal, Freda Tiller challenges her conviction on 18 counts of mail fraud. Tiller argues that the evidence at trial was insufficient to satisfy the mailing element of the statute, that the trial court erred in instructing the jury concerning this element, that the prosecutor was allowed to make inaccurate statements about this element in closing argument, and that the trial judge erred in calculating the amount of loss for sentencing purposes. We affirm.

I.

During the 21-month period covered by the indictment, Freda Tiller was employed as a managed care caseworker by Villanova Rehabilitation Consultants ("VRC"), a medical managed-care consulting firm. VRC employed caseworkers such as Tiller to monitor the medical care provided under insurance policies. The Philadelphia Housing Authority ("PHA") contracted with VRC to monitor the medical treatments covered by PHA's workers' compensation insurance policies. The service for which PHA bargained was in-person, on-site monitoring of the medical care administered by health care professionals to PHA

2

employees ("claimants") who received treatment for on-the-job injuries. Individual PHA claimants were assigned to VRC caseworkers, who were responsible for meeting with claimants at the doctors' or physical therapists' offices and then preparing detailed written reports. When a caseworker first met with a claimant, the caseworker prepared a report entitled "PHA Initial Assessment," and subsequent contacts with a claimant resulted in the preparation of "Follow Up" reports. In addition to preparing these reports, caseworkers were required to document their activities on VRC records known as "Weekly Activity Summaries and Expense Reports," which tracked the number of visits the caseworker made for each two-week pay period.

VRC billed PHA for its services on a per-visit basis. Caseworkers submitted their reports to VRC, which in turn prepared an invoice. The invoice broke down the activity for which PHA was being charged, including travel time, time spent on the visit, and any incidental expenses (e.g., telephone calls). VRC then sent the invoice to Crawford and Company ("Crawford"), the third-party administrator for the PHA workers' compensation program. Based on the invoices and reports received from VRC, Crawford prepared checks payable to VRC. These checks were mailed from Crawford's office in Broomall, Pennsylvania, to VRC in Wayne, Pennsylvania.

VRC paid Tiller a base salary, as well a $40 bonus for every visit made and reported in excess of six visits per

week. Caseworkers received bi-weekly pay checks from VRC that included any bonuses.

Tiller devised and executed a scheme to obtain additional bonuses by stating that she had visited PHA claimants when in fact she had not. Unaware of this fraud, VRC then billed PHA for these visits in invoices that it submitted to Crawford, and Crawford mailed VRC checks as payment for visits that had never taken place.

Tiller was charged with 41 counts of mail fraud under 18 U.S.C. S 1341. After the government withdrew 23 counts, the case was submitted to the jury, which convicted Tiller of the remaining 18 counts. Tiller's post-trial motions were denied, and she was sentenced to a term of 15 months of

imprisonment and three years of supervised release, and was ordered to pay $5,000 in restitution. This timely appeal followed.

II.

A.

Tiller argues on appeal that the evidence at trial was insufficient to establish the mailing element of the federal mail fraud statute. Specifically, Tiller contends that (1) the success of the scheme had been achieved prior to the mailings, and (2) the mailings were not reasonably foreseeable to her. We disagree.1 First, we hold that the mailings were incident to an essential part of the ongoing scheme. Second, we hold that the mailings were reasonably foreseeable under the circumstances.

1. The federal mail fraud statute provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice or attempting so to do . . . knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any [matter or thing whatever to be sent or delivered by the Postal Service or a private or commercial interstate carrier] shall be [guilty of the offense].

18 U.S.C. S 1341.

The Supreme Court has stated that the purpose of the mail fraud statute is "to prevent the post office from being used to carry [fraudulent schemes] into effect." Durland v.

_____

1. The proper standard of review is whether, viewing the evidence in the

light most favorable to the government, together with all reasonable inferences to be drawn therefrom, there is sufficient evidence to prove guilt beyond a reasonable doubt. See Glasser v. United States, 315 U.S. 60, 80 (1942).

4

United States, 161 U.S. 306, 314 (1896); Parr v. United States, 363 U.S. 370, 389 (1960). The Court has cautioned that the federal mail fraud statute "does not purport to reach all frauds, but only those limited instances in which the use of the mails is a part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law." Kann v. United States, 323 U.S. 88, 95 (1944).

Two statutory requirements for the mailing2 element are at issue on appeal. First, the mailing must be "for the purpose of executing the scheme, as the statute requires," Kann, 323 U.S. at 94. However, "[i]t is not necessary that the scheme contemplate the use of the mails as an essential element"; the mailing suffices if it is"incident to an essential part of the scheme." Pereira v. United States, 347 U.S. 1, 8 (1954). We must therefore inquire whether the mailings in this case were "sufficiently closely related" to the scheme to bring the conduct within the statute. United States v. Maze, 414 U.S. 395, 399 (1974).

Second, the defendant must "knowingly cause" the use of the mails. The Pereira Court clarified that the necessary intent in a mail fraud prosecution is the defendant's intent to engage in the scheme to defraud. Although a defendant must cause a mailing in furtherance of a fraud, that mailing may be incidental to the fraud, and the defendant need not personally send the mailing or even intend that it be sent. A defendant "causes" the mails to be used where the defendant "does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended . . . ." Pereira, 347 U.S. at 8-9.

a. We turn first to the question whether a reasonable jury could have concluded that the mailings in this case were "incident to an essential part of the scheme," Pereira, 347 U.S. at 8, or, put another way, whether the charged mailings were "sufficiently closely related" to the scheme to bring Tiller's conduct within the federal mail fraud statute, Maze, 414 U.S. at 399. We conclude that there was

_____

2. We use the term "mail" and "mailing" to include any mode of delivery covered by the mail fraud statute.

5

sufficient evidence in the record for a reasonable jury to have so found.

Tiller argues that this case is like Kann v. United States,

323 U.S. 88 (1944), Parr v. United States, 363 U.S. 370 (1960), and United States v. Maze, 414 U.S. 395 (1974). In Kann, corporate officers and directors were accused of having set up a dummy corporation through which to divert corporate profits to their own use. The defendants were accused of fraudulently obtaining checks payable to them and cashing or depositing those checks at a bank that then mailed the checks for collection against the drawee bank. Holding that the fraud was completed at the point at which the defendants cashed their checks, the Supreme Court stated:

> The scheme . . . had reached fruition. The persons intended to receive the money had received it irrevocably. It was immaterial to them, or to any consummation of the scheme, how the bank which paid or credited the check would collect from the drawee bank. It cannot be said that the mailings in question were for the purpose of executing the scheme, as the statute requires.

Kann, 323 U.S. at 94.

In Parr, the defendants were charged with having obtained gasoline and other products and services for their own purposes by the unauthorized use of a gasoline credit card issued to their employer. The oil company that furnished products and services to the defendants mailed invoices to the employer for payment, and the employer's payment was made by check sent in the mail. Relying on Kann, the Supreme Court held in Parr that there was not a sufficient connection between the mailings and the execution of the defendants' scheme because it was immaterial to the defendants how the oil company went about collecting its payments.

In Maze, the defendant stole his roommate's credit card and used it to obtain food and lodging while driving across the country. The Supreme Court held that the defendant's scheme had reached fruition when he checked out of each motel. The success of the scheme in no way depended upon

6

the mailings, the Court reasoned. Maze, 414 U.S. at 402. Rather, the mailings simply determined "which of[the defendant's] victims ultimately bore the loss." Id. The Court concluded that "the mailings [ ] were directed to the end of adjusting accounts between the motel proprietor, the[ ] bank, and [the roommate], all of whom had to a greater or lesser degree been the victims of respondent's scheme." Id.

These cases are distinguishable from the case at bar. Had Tiller submitted a single false report to VRC, been paid for her work by VRC, and then moved on to other employment, Tiller's argument would have greater force. But Tiller's was an ongoing fraud, similar to the scheme in Schmuck v. United States, 489 U.S. 705 (1989). There, the defendant over a period of years sold cars with rolled-back odometers

to a group of dealers at prices that were artificially inflated by the low-mileage readings. The unwitting dealers then predictably resold the cars to customers at even higher prices. The dealers mailed title forms to the state to complete the sales. The indictment charged that the defendant's fraud was directed at the ultimate buyers of the cars, who overpaid for the vehicles. In Schmuck , the mailings were essential to obtain new and apparently "clean" certificates of title for the purchaser. If clean certificates of title had not been obtained, the cars would not have been marketable, and the scheme ultimately would not have been successful. Therefore, the Court held that "although the registration-form mailings may not have contributed directly to the duping of either the retail dealers or the customers, they were necessary to the passage of title, which in turn was essential to the perpetuation of Schmuck's scheme." Schmuck, 489 U.S. at 712.

Here, Tiller is in much the same position as Schmuck; VRC's position is akin to the retail car dealers'; and the position of PHA and Crawford resembles that of the retail car customers. As in Schmuck, it was essential to the continuation of Tiller's scheme that each transaction be completed in an orderly fashion. We agree with the government that a rational jury could have concluded that Tiller's fraud depended on her continued harmonious relationship and good reputation with her employer, which in turn depended on her employer's ability to continue to

7

receive payment from Crawford by mail for the claims that Tiller submitted. Just as Schmuck's scheme "would have come to an abrupt halt if the dealers either had lost faith in Schmuck or had not been able to resell the cars obtained from him," Schmuck, 489 U.S. at 712, Tiller's ongoing scheme would have quickly ended if VRC had not received checks from Crawford for Tiller's work. We, therefore, hold that the government adequately proved that the mailings were sufficiently closely related to the scheme to defraud.

b. Next, we address the question whether Tiller "knowingly caused" Crawford to use the mails. Nothing in the record demonstrates that Tiller actually knew that Crawford would mail the checks to VRC. Tiller argues that the government's own witnesses testified that she would not have had any knowledge regarding the PHA/VRC contract, the billing procedures, billing rates, or accounting procedures. Moreover, Tiller argues that the only evidence concerning her knowledge of the use of mails came during the defendant's case, namely, when Tiller stated during cross-examination that she supposed that all businesses probably use the mails in some way. Appellant's Br. at 19.

As we noted above, however, under Supreme Court precedent, subjective intent or knowledge regarding the use of the mail is not required; reasonable foreseeability is sufficient. This is an objective, not subjective, test. As the government states in its brief, "[w]here a person is working

for a monitoring service, knowing that her employer has been retained by the benefit provider, it is obvious that the mailing of payment by the provider to the employer for its service is reasonably foreseeable to an objective observer." Appellee's Br. at 18. Although the prosecution was required to prove that Tiller specifically intended to defraud, the prosecution was not obligated to show that she planned a mailing or even knew that mailings would occur. All that was required was proof that a mailing (or other covered delivery by an interstate carrier) would have been reasonably foreseeable to an objective observer. Taking all inferences in the government's favor, we conclude that there was sufficient evidence to support the jury's verdict.

B.

Tiller argues that the District Court abused its discretion in its charge to the jury.3 The District Court gave the following jury instruction with respect to the mailing element:

> [1] The third element of mail fraud requires that the Government prove beyond a reasonable doubt that the United States mails were used in furtherance of the scheme to defraud.

> [2] Under the law, when a defendant does an act with knowledge that the use of the mails will follow in the ordinary course of events, or where such use of the mails can reasonably be foreseen, even though not actually intended, then he or she causes the mails to be used.

> [3] Therefore, if you are satisfied beyond a reasonable doubt that the defendant engaged in the scheme to defraud as charged in the indictment, and that the use of the mails was a reasonably foreseeable consequence of this scheme and that the individual mailings charged in the indictment contributed to the carrying out of the scheme, the mailing element of the offense is satisfied and you may find the defendant guilty of mail fraud.

> . . .

> [4] The Government must prove, however, that the use of the mails furthered, advanced or carried out in some way the scheme to defraud.

> [5] Once participation in a scheme to defraud is established, a knowing participant is liable for any

---

3. The standard of review of a district court's ruling on points for charge is abuse of discretion. See United States v. Fischbach & Moore, Inc., 750 F.2d 1183, 1195 (3d Cir. 1984). We must "determine whether the charge, taken as a whole and viewed in the light of the evidence, fairly and

adequately submits the issues in the case to the jury." Ayoub v. Spencer, 550 F.2d 164, 167 (3d Cir. 1977). We do not isolate particular language, but rather examine it in the context of the entire jury charge. See United States v. Turley, 891 F.2d 57, 62 (3d Cir. 1989).

> mailing that subsequently takes place in connection
> with the scheme, whether or not the participant
> actually knows of or agrees to that specific mailing.

Tiller contends that this instruction was in error because the third paragraph did not contain any reference to "specific knowledge that the check from Crawford . . . would be placed in the mail pursuant to the normal course of business." Def. Motion for a New Trial at 12. Tiller submits that the third paragraph should have read as follows:

> Therefore, if you are satisfied, beyond a reasonable
> doubt, that the defendant engaged in the scheme to
> defraud as charged in the indictment, and that the use
> of the mails was a reasonably foreseeable consequence
> of this scheme or that the mail followed in the normal
> course of business of which the defendant had
> knowledge, and that the individual mailings charged in
> the indictment contributed to the carrying out of that
> scheme, the mailing element of the offense is satisfied
> and you may find the defendant guilty of mail fraud.

Id. at 11. Tiller also argues that the jury should have been instructed "as to the factors they should consider in determining whether or [not] the specific mailings as charged in the indictment were reasonably foreseeable to the defendant." Def. Motion at 14.

We reject these arguments. First, although the italicized language relating to "actual knowledge" was not included in the third paragraph quoted above, the District Court did instruct the jury regarding actual knowledge in the second paragraph. Moreover, the second paragraph of the District Court's instruction was almost a direct quotation of the Pereira Court's definition of the foreseeability requirement. Thus, we conclude that the jury was not misinformed as to how the mailing element could be met.

Second, with respect to the omission of language discussing "factors" that could be considered in deciding whether the mailings were reasonably foreseeable, we conclude that the District Court did not err. After both sides gave their closing argument and immediately before the court's charge, Tiller requested that the court alter its

charge on the foreseeability of the charged mailings using language from United States v. Smith, 934 F.2d 270 (11th Cir. 1991). Tiller wanted the court to instruct the jury

concerning the factors that it might consider in determining whether Tiller was liable for the charged mailing, factors that Tiller's counsel had argued in closing.

It is well settled that a trial judge has substantial discretion to select the language to be used in instructing the jury on the law so long as the judge's instructions are correct and do not omit essentials. See Douglas v. Owens, 50 F.3d 1226, 1233 (3d Cir. 1995); Harrison v. Otis Elevator Co., 935 F.2d 714, 717 (5th Cir. 1991) (trial court has broad discretion to compose jury instructions, as long as they are fundamentally accurate and not misleading); see also Wright & Miller, Federal Practice & Procedure: Civil 2d S 2556 ("The particular form of jury instructions used in a given situation generally is within the trial court's discretion."). Here, as we have noted above, the District Court's charge correctly stated that a defendant causes the mails to be used when she "does an act with knowledge that the use of the mails will follow in the ordinary course of events, or where such use of the mails can reasonably be foreseen." The District Court did not err when it chose not to mention factors that another circuit finds useful in evaluating mail fraud claims. Taken as a whole, the jury instructions correctly stated the legal standard for the mailing element, and we conclude that there is no basis for finding an abuse of discretion.

C.

Next, Tiller contends that the District Court erred in allowing the government to make an allegedly improper closing argument. Tiller complains that "the government argued to the jury that the mailing element of 18 U.S.C. S 1341 was satisfied because of a generalized knowledge that all companies use the mail and therefore it was reasonably foreseeable to defendant that Crawford[ ] would mail checks to [VRC] for payment." Appellant's Br. at 34. Tiller objects to the following statement:

> The standard for the element of the use of the mails is satisfied if the defendant engaged in a scheme as

11

> charged in the indictment and that the use of the mails was a reasonably foreseeable consequence of the scheme. I suggest to you, ladies and gentlemen, on this evidence that that element is easily satisfied.

> The defendant went to work for a company that is involved in the cost containment in the field of medicine. They're obviously in business, they do correspondence, it is certainly, ladies and gentlemen, reasonably foreseeable that the mails will be used.

As the District Court noted in denying Tiller's post-trial motion, Tiller did not make a contemporaneous objection to the government's closing argument. Failure to object at trial, absent plain error, constitutes a waiver of the issue

for post-trial purposes. See United States v. Young, 470 U.S. 1, 15 (1985). Moreover, the District Court correctly noted, even if Tiller had objected during the closing, there would have been no basis for a new trial because the government did not misstate the law. The government did not argue that the foreseeability of the mailings in this case was established by the fact that all companies use the mail, but rather that use of the mails was reasonably foreseeable in the circumstances of this case. The prosecutor's closing addressed the specific evidence in this case, which demonstrated that Tiller worked for a company that she knew used the mails, and that in the particular business in which she was involved -- provision and billing for cost containment services -- it was reasonably foreseeable that the mails would be used. Therefore, we conclude that Tiller cannot show any plain error on this record.

D.

Finally, Tiller argues that the District Court erred in calculating the amount of the loss used in determining the base-level offense for the purpose of sentencing. 4 Based on the amount that PHA paid for fraudulent Tiller visits, the

---

4. Sentencing findings are reviewed for clear error. See United States v. Gibbs, 190 F.3d 188, 203 (3d Cir. 1999). The burden of proof in the District Court is on the government, and the standard of proof is a preponderance of reliable evidence. Id.

12

District Court found the loss for guideline purposes was between $70,000 and $120,000. This total reflects the amount PHA paid for invoices tied to fraudulent Tiller reports in connection with the witnesses who testified at trial plus the probable loss sustained in connection with other claimants interviewed in the investigation and identified in discovery.

On appeal, Tiller does not argue that the District Court incorrectly determined the amount of money that PHA paid for invoices that billed for visits that she did not make. Rather, Tiller asserts that PHA suffered no actual loss because, she claims, her reports accurately set forth medical information about the claimants. The fact that this information was gleaned from medical reports, rather than from personal visits with claimants and doctors, did not, in her submission, cause PHA any loss. Tiller argues that because PHA did not suffer any actual loss, the loss for purposes of sentencing should be based on the amount of incentive pay (i.e., bonuses) that she received for the fraudulent reports submitted.

Tiller's argument ignores the critical fact that PHA bargained and paid for in-person, on-site monitoring of claimants, but was fraudulently deprived of this service. James Sredzinski, the former risk manager at PHA, testified at trial that (1) the purpose of hiring VRC was to make sure

that medical care was appropriate and that the claimants were not perpetrating frauds or malingering, App. at 292-93; (2) PHA's expectation was for VRC to "actually physically visit with the claimant while the claimant was at the provider's office or place of service", App. at 294; and (3) this aspect of VRC's service was "very, very important" to PHA, App. at 298.

If PHA had been paying for VRC to distill information contained in claimant medical files, then there would have been no fraud. But, the indictment charged:

> It was part of the scheme and artifice that defendant FREDA TILLER prepared and caused to be prepared "PHA Initial Assessment" and "Follow Up Reports"[ ], which falsely stated that she had met claimants at the offices of doctors and therapists (including industrial

13

> health clinics), and at the homes of claimants, when in fact she had not.

App. at 58. Consequently, the scheme for which Tiller was convicted was not the preparation and submission of reports that misstated the substance of the medical care being provided to claimants. Rather, Tiller was convicted of reporting that she had met with claimants when in fact she had not. The District Court correctly found that"[t]here is no question that PHA sustained a financial loss when it paid for visits that defendant never actually made. The loss is properly calculated based on the amount paid by PHA for visits with claimants that the defendant never made." Appellee's Br. at 33.

PHA's situation here is analogous to that of a person who contracts and pays for any other service that is intended to prevent some sort of damage before it occurs. Examples that come readily to mind are a termite inspection of a home prior to purchase, a contract for central monitoring of a burglar alarm system, or a medical test to detect the presence of a disease at an early stage. If a person contracts and pays for such services and the services are not furnished, the loss to the person who contracted for the services is the amount that the person paid. Just because it turns out that the house is not infested with termites, no burglars break into the house, and the person does not have the disease, it does not follow that the person has not suffered a loss. The person has paid for a service that the person did not receive. And the amount of the loss is the value of the service to the person in question, considering that person's level of risk aversion, which is to say the amount that the person paid. We therefore hold that the District Court did not err, much less commit a plain error, in its calculation of the loss in this case.

For the foregoing reasons, we affirm Tiller's conviction on all 18 counts for federal mail fraud under 18 U.S.C.S 1431.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit